Robert B. NEMEROFF, D. D. S.,
Plaintiff-Appellant-Cross-Appellee,

Hale and Dorr, Appellant-Cross-Appellee,

v.

Alan ABELSON, Robert Bleiberg, and
Dow Jones & Company, Inc.,
Defendants-Appellees,

Meyer Berman, Cumberland Associates,
Walter Mintz, Robert Wilson and Robert Wilson Associates, Defendants-Appellees-Cross-Appellants.

Nos. 229–232, Dockets 79–7366, 79–7410,
79–7412, 79–7423.

United States Court of Appeals,
Second Circuit.

Argued Dec. 19, 1979.

Decided March 17, 1980.

Simon H. Rifkind, New York City (Jay Greenfield, Robert S. Smith, Adele R. Wailand, Paul B. Kertman, and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for plaintiff-appellant-cross-appellee Robert B. Nemeroff and appellant-cross-appellee Hale and Dorr.

Rudolph W. Giuliani, New York City (Renee L. Cohen and Patterson, Belknap, Webb & Tyler, New York City, on the brief), for defendants-appellees Alan Abelson, Robert M. Bleiberg and Dow Jones & Company, Inc.

Andrew C. Freedman, New York City (Steven G. Storch, and Reavis & McGrath, New York City, on the brief), for defendants-appellees-cross-appellants Robert Wilson and Robert Wilson Associates.

Jack David, New York City (Steven Finell, and David & Finell, New York City, on the brief), for appellees-cross-appellants Cumberland Associates and Walter Mintz.

Julius Berman, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for defendant-appellee-cross-appellant Meyer Berman.

Before SMITH * and TIMBERS, Circuit Judges, and SAND,** District Judge.

PER CURIAM:

This is an appeal from a judgment entered in the Southern District of New York, Robert L. Carter, *District Judge*, 469 F.Supp. 630, assessing $50,000 in attorneys' fees and expenses against plaintiff-appel-

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judges Timbers and Sand who are in agreement on this opinion. Judge Smith, who heard the argument, unfortunately died on February 16, 1980. Prior to his death, Judge Smith expressed his agreement with his colleagues on all issues in the case. He did not have the opportunity, however, to see this opinion prior to his death.

** Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

lant Robert B. Nemeroff and his law firm, Hale and Dorr, on the ground that they commenced an action under the federal securities laws in bad faith. The district court awarded the fees to Alan Abelson, Robert Bleiberg, and Dow Jones & Company, three of the defendants in the action. The remaining defendants cross-appeal from the judgment below on the ground that they too should have been awarded attorneys' fees. For the reasons below, we affirm in part, reverse in part, and remand for further proceedings.

## I.

Robert B. Nemeroff, a practicing dentist in New York City, was a shareholder of Technicare Corporation ("Technicare"), a manufacturer of medical equipment. Represented by the well known Boston law firm of Hale and Dorr, and in particular by Gordon T. Walker, Esq., a member of the firm, Nemeroff commenced a two-count class action on March 25, 1977 in the Southern District of New York against twelve defendants, including all of the defendants-appellees. The defendants-appellees consist of three "publishing defendants" and five "short seller or investor defendants". The publishing defendants are Alan Abelson, author of a column entitled "Up & Down Wall Street", which appears in the financial weekly *Barron's*, of which he is a managing editor; Robert M. Bleiberg, the editor of *Barron's*; and Dow Jones & Company, Inc., the publisher of various financial publications and services, including *Barron's* and *The Wall Street Journal.* The short seller

or investor defendants are Meyer Berman; the hedge fund Cumberland Associates and its managing partner, Walter Mintz; and the hedge fund Robert Wilson Associates and its managing partner, Robert Wilson.

The first count of the complaint alleged that all the defendants had conspired to violate § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1975). This count alleged that the publishing defendants deliberately leaked non-public information about forthcoming Abelson columns to the investor defendants, and in particular that the publishing defendants gave advance warning to the investor defendants that Abelson would make negative comments about Technicare; that the comments caused or tended to cause a decline in the price of Technicare stock; that the publishing defendants did this in order to enable the investor defendants to trade at a profit; and that the investor defendants profited from the information by selling Technicare short prior to publication and making covering purchases at a depressed price after publication.

The second count named the investor defendants only. It alleged that they engaged in a manipulative scheme to depress the price of Technicare stock through a pattern of massive short selling in violation of §§ 10(b) and 9(a)(2) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78i(a) (1976).[1]

On January 6, 1978 an amended complaint was filed. Nemeroff abandoned his

---

1. We set forth here the provisions of the Securities Exchange Act of 1934 and Rule 10b–5 referred to in the complaint.

  15 U.S.C. § 78j(b) in relevant part provides:
  "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
  · · · ·
  (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, 17 C.F.R. § 240.10b–5 (1975), provides:
  "Employment of manipulative and deceptive devices.
  It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
  (a) To employ any device, scheme, or artifice to defraud,
  (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

allegation that the publishing defendants deliberately had leaked information about the Abelson columns to the investor defendants but alleged in his amended complaint that the investor defendants deliberately had *solicited* negative Abelson columns in an attempt to drive down the price of Technicare stock.

In May 1978, pursuant to plaintiff's voluntary stipulation to dismiss the action, an order was filed dismissing the action with prejudice.[2] The stipulation explicitly reserved defendants' right to move for costs and reasonable expenses, including attorneys' fees, but without plaintiff's conceding that defendants were entitled to them.

In June 1978 defendants moved for costs, disbursements and attorneys' fees on the

ground that the action had been commenced and prosecuted in bad faith.[3] Defendants requested that the award of attorneys' fees be "assessed against plaintiff and/or his counsel." Oral argument on defendants' motions was heard in September 1978. Thereafter additional documents were filed by both sides.

On April 18, 1979 the district court filed a comprehensive, reasoned opinion. 469 F.Supp. 630. The court held that the action had been commenced in bad faith against the publishing defendants and awarded them $50,000 in attorneys' fees and expenses to be taxed against Nemeroff and Hale and Dorr. The court held that the action had not been commenced in bad faith against the investor defendants and accordingly denied their motions for attorneys'

---

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
15 U.S.C. § 78i(a)(2) in relevant part provides:
"It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—
. . . .
(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities

exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

2. Earlier the action was voluntarily discontinued by stipulation as against four of the original investor defendants: Marc Howard, Marc Howard Associates, Lawrence Bleiberg and Boxwood Associates. These defendants are not involved in this appeal.

3. Defendants applied in the district court for the following attorneys' fees and disbursements:

| NAME OF DEFENDANT | IN DEFENDING ACTION | | IN APPLYING FOR FEES AND DISBURSEMENTS | |
|---|---|---|---|---|
| | Attorneys' Fees | Disburse-ments | Attorneys' Fees | Disburse-ments |
| Publishing Defendants | $141,571.00 | $6,163.37 | | $53,058.00 |
| Berman | 12,210.00 | 2,149.26 | | |
| Cumberland Associates and Mintz | 32,428.75 | 2,781.85 | $4,413.25 | 175.18 |
| Robert Wilson Associates and Robert Wilson | 43,744.00 | 4,132.33 | 9,434.00 | |

As indicated above, defendants sought a total of more than $322,000 in attorneys' fees and disbursements, of which more than $67,000 were *in connection with making the application for fees and disbursements.*

The district court awarded to the publishing defendants a lump sum of $50,000 in attorneys' fees and disbursements to be taxed against plaintiff and his counsel. No other attorneys' fees or disbursements were awarded.

fees and expenses. The court held that defendants were the prevailing parties and granted their motions for costs to be taxed against plaintiff pursuant to Fed.R.Civ.P. 54(d). Pursuant to the parties' stipulation, the court ordered that the action be dismissed with prejudice.

On May 10, 1979 a final judgment was entered in accordance with the court's opinion. From that judgment, the instant appeal and cross-appeals have been taken as stated above.

## II.

In January 1977 Gordon T. Walker and Hale and Dorr first became involved in the discussions which led to the commencement of this action. At that time Walker met with a client of Hale and Dorr, Herbert Stein, who was a shareholder of Centronics Data Computer Corporation ("Centronics").[4] By then *Barron's* already had carried several Abelson columns critical of Technicare.[5] Stein told Walker that he was concerned that Abelson also would criticize Centronics in a forthcoming column. Stein said he had been informed that Abelson had criticized Technicare at the instance of several investors, including Robert Wilson, who had established large short positions in Technicare. Stein said that the same investors had established short positions in Centronics. Stein also mentioned that the Technicare trading was being investigated by the New York Stock Exchange ("NYSE") and the Securities and Exchange Commission ("SEC"). He gave Walker the names of two brokers who had voiced suspicions about the Technicare trading.

During the period between the meeting with Stein in January and the commencement of the action in March, Walker and his firm investigated the allegations regarding Technicare and Centronics. Walker called the NYSE and the SEC and received confirmation that they were investigating complaints about Technicare. Walker spoke to Howard Roth, one of the brokers mentioned by Stein, who reiterated his suspicions about the trading in Technicare. He stated that Nemeroff, his client, was considering commencing an action against Dow Jones and the investors holding short positions in Technicare. He added that Nemeroff would be represented by Paul, Weiss, Rifkind, Wharton & Garrison in the action. Later, Roth informed Walker that Nemeroff would not be represented by Paul, Weiss at that time—for reasons not relevant here—and that he had recommended to Nemeroff that he retain Hale and Dorr. Nemeroff later decided that he wanted Hale and Dorr to commence an action on his behalf. On March 20 an associate of Hale and Dorr discussed a draft complaint with Nemeroff. The complaint was filed on March 25.

In the remainder of this section of our opinion, we shall summarize only those facts believed to be necessary to an understanding of our rulings on the legal questions presented. The essential facts are those which led Walker to believe that there were adequate grounds for the commencement of Nemeroff's action against defendants. These facts fall generally into two categories:[6] first, the nuts and bolts of

---

**4.** Our summary of the facts and prior proceedings is based upon the record before us. It consists entirely of documents, including pleadings, affidavits and depositions. No evidentiary hearing was held in the district court. *See Dopp v. Franklin National Bank,* 461 F.2d 873, 878–79 (2 Cir. 1972).

**5.** Note 7, *infra.*

**6.** After concluding that both Nemeroff and Hale and Dorr were "culpable", the district court stated:

"Plaintiff and his broker, among others, pressured counsel into filing this baseless lawsuit,

even though they and counsel knew or should have known that the allegations were not susceptible of proof sufficient in a court of law. Counsel, however, was under a professional obligation to resist his client's insistence that this lawsuit be brought, but did not." 469 F.Supp. at 642.

Underlying the bad faith exception to the general rule governing allocation of litigation costs, referred to under Section III, *infra,* of this opinion, is a tension between deterrence of bad faith or meritless lawsuits, on the one hand, and, on the other hand, a desire to avoid chilling the filing of meritorious actions. It is consistent with these underlying goals that a

the alleged conspiracy, including Abelson's columns, Abelson's relationship with the investor defendants, and the pattern of trading in Technicare; and second, Walker's contacts with the NYSE attorneys.

## THE COLUMNS

*Barron's* carried a series of articles beginning in May 1976 which mentioned Technicare or the CAT scanner market. All but one were written by Abelson. To the extent that these columns were negative, and not all of them were,[7] they stated that the market for CAT scanners was going to level out because of various factors, including their high cost and the increasing concern over the rising cost of medical care, increased competition, and state regulation of hospital expenditures. The columns indicated that Technicare would be particularly

plaintiff be allowed to rely to a reasonable extent on the investigation of his counsel. Our conclusion that the instant action was not entirely without foundation, judged in the light of the information revealed by the Hale and Dorr investigation, is sufficient to insulate both Hale and Dorr and Nemeroff from a finding of bad faith. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (1966) (verification of complaint under Fed.R.Civ.P. 23(b) by barely literate plaintiff in reliance on her son-in-law's explanation of the facts did not warrant dismissal); *Brand v. Tisch*, 253 F.Supp. 122 (S.D.N.Y.1966) (Fed.R. Civ.P. 23(b) satisfied when plaintiff verified a complaint on the basis of his good faith reliance on the advice of an advisor, whose qualifications and integrity were known to plaintiff).

7. The articles in question appeared at various intervals between May 3, 1976 and the filing of the complaint.

The article of May 3, 1976, after praising Technicare, stated:

"All in all, seemingly, a very bright picture. Yet, as our colleague, Steve Anreder, discovered last week after chatting with a number of sources, from makers and users of CTs to medical researchers and FDA staffers, one that still may contain a few dark spots. For one thing, we might note, Technicare's CT sales pattern is erratic: it booked 33 new orders in the March quarter, up from 16 the previous three months but only half the 66 in its opening fiscal quarter. That suggests that demand for the device may be characterized by fits and starts.

More important, while the overall market for the space-age scanners is undeniably expanding rapidly, some insiders who have made a careful study of the prospects before taking the plunge believe it will level out within several years. And perhaps most significant of all, the growth of the field seems in danger of being swiftly outstripped by the growth in the number of competitors."

The column of June 14, 1976 made a brief negative reference to Technicare:

"A few weeks back, as the basis for a somewhat skeptical comment on Technicare, we cited rising CAT fever—the proliferating number of these computer-cum-X ray items (and the proliferating number of companies rushing into the field). Well, that competi-

tion is by no means limited to local contestants. Japanese have worked up an entry . . . ."

The column of July 19, 1976 did not mention Technicare by name, but did note that the large corporations in the market, such as GE and Pfizer, were more likely to succeed in the long run.

The column of August 16, 1976 was not written by Abelson, and did not mention Technicare specifically. It predicted a general "shakeout" of the CAT scanner market.

The column of October 11, 1976 mentioned CAT scanners in passing, and noted that Ralph Nader had been critical of the devices, without mentioning Technicare specifically.

The column of January 10, 1977 summarized the negative comments of the May 3, 1976 column, and went on to state:

"Technicare will continue to do well over the short run, if only because it enjoys a sizable backlog of orders built up before the states began to put on the brakes. Sooner or later, though, we'd expect, the company will feel the drag of go-slow policies. Moreover, Technicare is one of the two front-runners in the field, hence, any stretch-out is likely to prove especially harmful, since it will give the competition valuable time to cut down on the company's technical lead."

The columns of February 14, 1977 and February 28, 1977 involved an erroneous report by Abelson that Technicare had failed to sign a distributorship agreement, followed by a retraction.

The information uncovered by the Hale and Dorr investigation of course must be judged in light of the requirements for stating a cause of action under §§ 9(a)(2) and 10(b) of the Exchange Act. Thus, if there is clear evidence that a necessary element of a cause of action is not susceptible of proof, then that cause of action as a whole necessarily is without foundation. Individuals who trade in a company's stock with knowledge that a favorable or unfavorable article about that company will appear are "quasi-insiders" who may have a duty of disclosure. *See Zweig v. Hearst Corp.*, 594 F.2d 1261 (9 Cir. 1979); *see generally* Fleischer, Mundheim & Murphy, *An Initial Inquiry into the Responsibility to Disclose Market Information*, 121 U.Penn.L.Rev. 798 (1973).

vulnerable, due in part to its proportionately large reliance on CAT scanner sales.

## THE TRADING

Technicare was first listed on the NYSE in December 1975. During the first two months of 1976 approximately 100,000 shares were sold short. The aggregate short position remained relatively stable until October 1976, when it began to rise sharply.[8] The aggregate position was over 238,000 shares by March 1977, when the complaint was filed.

The price of Technicare stock rose until approximately the end of 1976, when it began to decline. The only Abelson column which was closely related to a decline in the price of Technicare stock was that of January 10, 1977. Technicare fell almost three points, to $34.50, after that publication.

## THE NYSE INVESTIGATION

An important factor relied on by Walker in determining whether there was any basis for the charges against the publishing and investor defendants was what he under-

stood to be the conclusion reached by the NYSE that there was in fact a "correlation" between the appearance of the Abelson articles and the short sales of Technicare stock. Walker says that he was told on February 3, 1977 by an NYSE attorney, Jeffrey Hass, Esq., that there was "no doubt" of a "relationship" between the short sellers and Abelson. Hass later denied making those statements; but in a supplemental affidavit he conceded that he could understand, based on their February 3 conversation, how Walker "could have come away from the conversation with the good faith impression that I had made such statements."[9] The district court found—erroneously in our view—that the February 3 conversation was immaterial, because of a February 8 conversation which Walker had with Hass and others at the NYSE during which the NYSE people purportedly indicated that the NYSE was satisfied that there was no support for charges of manipulation. The critical fact, however, is that on February 8 Walker learned only that the NYSE was satisfied that the *Technicare*

---

**8.** In November 1976 the aggregate short position in Technicare increased to 146,825 shares; in December 1976 it increased to 191,427 shares; by January 1977 it had reached 202,739 shares.

Although these figures represent only aggregate short positions and do not disclose the identities of particular short sellers, Walker had been told by Howard Roth that Wilson, Berman, and Mintz were involved in the short selling. Roth told Walker that persons executing trades for the hedge funds had disclosed to him the identities of the short sellers. The short selling of Wilson, Berman and Mintz was confirmed in information which became available later.

Walker also discovered from records of the *Business Week* litigation, note 11, *infra*, that Wilson, Berman and Mintz all knew Abelson and all spoke with him periodically. Later information revealed frequent meetings during the relevant period, particularly between Abelson and Mintz.

**9.** Hass' first affidavit in relevant part stated: "I told Mr. Walker that the New York Stock Exchange was preparing a chart to see if there was a correlation between the short position in Technicare and Alan Abelson's columns in *Barron's*. I never at any time described for Mr. Walker the contents of such a chart. Specifically, I did not say that there was 'no doubt' of a relationship between the short sellers and Mr. Abelson. In

fact, I believe that the chart prepared by the Stock Exchange shows that just the opposite is true."

Hass' supplemental affidavit in relevant part stated:

"Based upon my further reflection on this matter, I believe it may be useful to supplement and clarify my prior affidavit. I do not believe that my recollection of my conversation with Mr. Walker is necessarily inconsistent with Mr. Walker's recollection. Although it is still my recollection that I did not make several of the statements attributed to me by Mr. Walker, in the context of the entire discussion I can understand how he could have come away from the conversation with the good faith impression that I had made such statements.

. . . .

As I noted in my prior affidavit, I told Mr. Walker that I believed Ms. Donovan's testimony before the New York Stock Exchange was truthful.

. . . .

It was always apparent to me that Mr. Walker had a good faith belief both that this was a meritorious cause of action and that there was good ground to support it as against each of the defendants. I never said anything to him to dissuade him from that view."

*specialist* of the NYSE was not involved in manipulation. Walker did not receive the report of the NYSE investigation until July 1977.

In addition to the foregoing, Walker points to other facts which led him to con-

10. On March 21, 1977 the *Wall Street Letter* printed an article entitled "Olympia's Trading Fiasco: The Controversial Role of the Hedge Funds". In that article Wilson was quoted as follows:

" 'I was very curious about this [a price rise in Olympia Brewing shares] and told Alan Abelson, with whom I have had dinner on occasion.' . . . 'I hoped he (Abelson) would do an investigation.' . . . 'In the past I have urged him to recommend—and to disrecommend—stocks and he's done it. My participation in the stock was always before any article, although sometimes I have added to it after.' "

11. In 1975 *Business Week* printed an article attributing to an investor the statement that he "has a golden news leak and has profited from it. He often knows in advance what Alan Abelson, the Barron's columnist will be saying." Dow Jones, Inc. and Abelson brought a libel suit, which was settled. *Business Week* printed a retraction, which provided in part that:

"there was no evidence that advance information on the contents of Barron's was intentionally leaked to investors by Abelson, Barron's or Dow Jones . . . ."

In the instant case, appellees and the district court relied on a conversation which Walker had with Richard Grimm, president of Technicare, on March 14, 1977, after his conversation with Hass and the NYSE. Grimm taped the conversation, which is set forth here in relevant part:

"WALKER: . . . I have *no intention of* bringing such a suit as this before I'm satisfied that there is a substantial basis for it. . . . [R]eally in a case such as this the lawyer's responsibility is to have almost a criminal standard of liability proven before a suit such as this brought—[sic] proof beyond a reasonable doubt.

GRIMM: Is it unfair to ask you, Gordon, at this point in time what degree of comfort you have with the ability to prove beyond a reasonable doubt?

WALKER: . . . It's a very difficult situation because much of the proof is documentary which we simply aren't going to be able to get until we have subpoenas. So I have some bits and pieces which I've been able to get from people who are willing to talk to us. It certainly corroborates the story we've been hearing, and there are a few who have stories to tell about Marc Howard, Bob Wilson and the short sellers, and these stories certainly,

clude that there were adequate grounds for commencing the action, including statements by Robert Wilson in a market newsletter [10] and what Walker understood to be prior similar conduct on the part of Abelson and the investor defendants.[11]

if true, would sustain the action. So right now I'm in a position of trying to verify what I've heard. If what I've heard is true, then I'm perfectly convinced that there is a valid cause of action.

I think, however, that it is inappropriate to focus on Barron's or Alan Abelson as being the only key to this thing. I think really more it's a concerted action on behalf of the hedge funds to manipulate the price of the shares by a pattern of short selling activity, which in itself, in my opinion, is actionable and is a manipulative device. So that's the principal focus I have at this time.

. . . .

I've tried to make it very clear to him [Howard Roth]: No. 1—I'm not going to do much until I have some assurance that we will be paid, and No. 2—at that time I have some more detective work, if you want to call it that, to satisfy myself that this suit should be brought. I do want to make clear, however, that I am reasonably satisfied. I think it's a very valid, legitimate cause of action, and I think it should be brought at some point.

. . . .

[O]nce we're satisfied that there is a substantial basis to these allegations, then I see no problem in bringing the suit. As far as the substantiation is concerned, I think we have a great deal more on the short selling, the facts of the short selling, the apparent facts, which may be a contradictions [sic] of terms, of collusion, acting in concert, manipulating the price of the shares. I also have a lot of wild stories and there are people who, as I say, I've spoken to, who tell me some incredible things.

. . . .

And this is in my opinion, but this is not the basis for my attendant conclusion, is about what's going on, in a sense—that Abelson calls Mark Howard or Bob Wilson and says 'what do you think of Technicare' and Wilson says 'I think it's lousy, GE's getting into the business and I'm short the stock . . .' and Abelson asks a few more questions and so the person he was speaking with knows pretty well that if this sort of article goes out it increases the short position.

. . . .

Just for example, I pulled from Abelson's columns over the last 12 months just the names, nothing but the names of the compa-

## THE DISTRICT COURT OPINION

In its opinion of April 18, 1979 the district court found that the action was *commenced* in bad faith, but it made no finding on the propriety of plaintiff's *conduct* of the litigation. The court found it unnecessary to reach the latter issue in view of its approach to the case. 469 F.Supp. at 632 n.2.

With respect to the commencement of the action, the court found, as to appellants' motive, that "[t]he evident purpose was to secure maximum publicity harmful to the publishing defendants" and that "[c]learly, the purpose could not have been to litigate on the merits." *Id.* at 635–36. As to the colorability of appellants' complaint, the court found that, although Nemeroff, Roth and other Technicare investors believed that Abelson was guilty of wrongdoing, "[t]he suit was filed either with the knowledge that counsel had no adequate factual basis to sustain the allegations or in reckless disregard of the fact that proof of the charges was not available. In either circumstance, plaintiff and his counsel knowingly proceeded with litigation that lacked foundation." *Id.* at 636. The court also stated that "neither the plaintiff, his counsel, Roth, nor Stein had one iota of proof—in the sense that term is defined in a court of law—that Abelson was leaking any in-

formation to the short-selling defendants." *Id.* at 635. The foregoing constitute the underpinning for the court's ultimate finding that the action was commenced in bad faith.

## THE STANDARD OF REVIEW

Despite the invitation by counsel that we conduct a de novo review of the facts in view of the unique character of this proceeding, we find it unnecessary to do so. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2 Cir. 1979); *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750–53 (2 Cir. 1977); *Dopp v. Franklin National Bank*, 461 F.2d 873, 878–79 (2 Cir. 1972). As we have indicated above, note 4, *supra*, the record before us consists entirely of documents and no evidentiary hearing was held in the district court.

We hold, based on our careful examination of the entire record, that the district court's finding that the action was commenced in bad faith was clearly erroneous. Fed.R.Civ.P. 52(a)[12] Central to the court's clearly erroneous ultimate finding of bad faith was the court's erroneous subordinate finding regarding Walker's knowledge of the results of the NYSE investigation.

---

nies he's talked about and there aren't really a great number of them. If you just read Alan Abelson you think that it's a pretty small universe, and how many thousands of publicly traded companies are there. Then when we compare these names with the names of the short positions that some of these hedge funds have, the correspondence is incredible. I've also learned from the New York Stock Exchange, although I don't have it, that they have, of course, access to a lot more information than we do, that they've put together a chart comparing the short sales of the customers of some of their member firms with the Abelson articles, that there is a high degree of correlation. Now I got this on the telephone from someone on the phone at the exchange but when I went in to talk to them they were not about to give me any hard information. The young fellow on the phone just wanted to impress me with how important he was on the telephone.

But I'm convinced that it's happening and when you put it together I think there's a substantial basis for bringing the suit. Whether there's a substantial basis for ruin-

ing Alan Abelson's reputation, at this point I don't know and that troubles me a great deal."

Far from indicating Walker's bad faith, the foregoing transcript strikes us as indicating that Walker believed that the action would be well-founded, and yet held back from commencing it because he felt he had to be particularly certain of the adequacy of the grounds for the action before risking injury to the reputation of the defendants. Although the transcript is ambiguous as to whether Walker believed the publishing defendants were leaking or the investor defendants were soliciting, one plausible interpretation is that Walker believed that Abelson's phone calls to the investor defendants were in essence deliberate leaks.

12. Rule 52(a) in relevant part provides:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . . . ."

## III.

■ The general American rule governing allocation of the costs of litigation places the burden of counsel fees on each party, regardless of the outcome of the action. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975) (no "private attorney general" exception to the general rule); *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 126 (1974) (reversing award of fees under Miller Act where there was no explicit statutory provision). Although the origin of the so-called American rule is somewhat unclear, there is no doubt about its current vitality.[13]

■ Fees can be shifted to the prevailing party under various exceptions to the general rule. The most important of these are the explicit statutory provisions which recently have proliferated.[14] Another instance of fee-shifting is the "common benefit" exception which spreads the cost of litigation to those persons benefiting from it. *Hall v. Cole*, 412 U.S. 1 (1973); *Mills v. Electric AutoLite Co.*, 396 U.S. 375 (1970); *see also Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939) (fee shifted where plaintiff established right of others to recover from specific assets through stare decisis); *Trustees v. Greenough*, 105 U.S. 527 (1882). Finally, there is the exceptional power to shift fees where an action has been commenced or conducted "in bad faith, vexatiously, wantonly or for oppressive rea-

sons." *F. D. Rich Co. v. United States ex rel. Industrial Lumber Co., supra*, 417 U.S. at 129; *accord, Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078 (2 Cir. 1977); *see also Vaughan v. Atkinson*, 369 U.S. 527 (1962) (in admiralty, damages for failure to give maintenance and cure may include counsel fees as "necessary expenses" where defendant wilfully failed to respond to plaintiff's request for such maintenance).[15]

*Browning Debenture Holders', supra,* clarified the requirements for a finding of bad faith in this Circuit. We held that there must be "clear evidence" that the claims are "entirely without color *and* made for reasons of harassment or delay or for other improper purposes." 560 F.2d at 1088 (emphasis added). In the instant case we find it unnecessary to reach the question of the motives of Nemeroff or his counsel, for we hold that the claims were not "entirely without color" at the time the action was commenced.

■ A claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim.[16] The question is whether a reasonable attorney could have concluded that facts supporting the claim *might be established*, not whether such facts actually *had been established*.

13. For a comprehensive discussion of the history of the American rule, *see Alyeska Pipeline Co. v. Wilderness Society, supra*, 421 U.S. at 247–59.

14. *E. g.*, The Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988 (1976). *See also Alyeska Pipeline Co. v. Wilderness Society, supra*, 421 U.S. at 260–69.

15. The history of the equitable power to assess reasonable attorneys' fees is treated comprehensively in *Guardian Trust Co. v. Kansas City Southern Ry.*, 28 F.2d 233, 240–46 (8 Cir. 1928). *See also Hutto v. Finney*, 437 U.S. 678, 689 n.14 (1978) ("[a]n equity court has the unquestioned power to award attorney's fees against a party who shows bad faith by delaying or disrupting the litigation or by hampering the enforcement of a court order [citing *Alyeska* ]"); *DerRong Chour v. Immigration and Naturalization Ser-*

vice, 578 F.2d 464 (2 Cir. 1978) (award of damages under 28 U.S.C. § 1912 (1976) and Fed.R. App.P. 38 affirmed where petitioner made frivolous and completely meritless claims to delay deportation); *National Association of Letter Carriers v. U.S. Postal Service*, 590 F.2d 1171 (D.C. Cir. 1978) (refusal to award fees based on bad faith upheld); *Amoco Oil Co. v. Oil, Chemical and Atomic Workers Local 7–1*, 548 F.2d 1288, 1296 (7 Cir.), *cert. denied*, 431 U.S. 905 (1977) (claims not "wholly devoid of merit"); *Randolph Engineering Co. v. Fredenhagen Kommandit-Gesellschaft*, 476 F.Supp. 1355, 1361–62 (W.D.Pa.1979); *Miller v. Schweickart*, 413 F.Supp. 1059 (S.D.N.Y.1976) (Weinfeld, J.).

16. *See* ABA Model Rules of Professional Conduct § 3.3, Comment (Discussion Draft 1980).

■ We hold here that a reasonable attorney could have concluded, with respect to the first count of the complaint, that there was a relationship, in some cases a close relationship, between Abelson and the investor defendants; that Abelson had made comments critical of Technicare; that the price of Technicare had declined during the period in which Abelson's columns were published; that the investor defendants had sold Technicare short; and that the NYSE had found a correlation between the Abelson columns and the pattern of short trading.

As for the second count which alleged that the investor defendants had violated § 9(a) of the Exchange Act, we hold that a reasonable attorney could have concluded that there was an unusual pattern of short sales of Technicare stock and that this pattern of sales was intended to depress and manipulate the price of Technicare stock.

Even if some or all of these facts were not in fact true or might later fail to be established, that is irrelevant to the determination of bad faith under our law. These reasonable beliefs were factually and legally sufficient. To require more would promote the unwarranted abortion of many potentially meritorious claims.

### IV.

Aside from invoking the bad faith exception to the general American rule for the award of attorneys' fees, appellees also sought to ground the award on § 9(e) of the Exchange Act, 15 U.S.C. § 78i(e),[17] and Fed. R.Civ.P. 11.[18] The district court concluded that the "ultimate question" under § 9(e)

and Rule 11 was "whether the plaintiff and/or counsel instituted the action 'in bad faith, vexatiously, wantonly or for oppressive reasons.'" 469 F.Supp. at 637 (citing *Browning Debenture Holders', supra,* and *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n.30 (1976)). Congress has enacted a number of statutory exceptions to the general rule governing attorneys' fees. Some statutes require that reasonable fees be awarded to the prevailing plaintiff; other statutes are permissive. Some permissive award statutes, such as § 9(e), authorize an award of fees by the court "in its discretion". By contrast, § 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e) (1976), authorizes an award of fees to the prevailing party "if the court believes the suit or the defense to have been without merit"; and § 323 of the Trust Indenture Act, 15 U.S.C. § 77www(a) (1976), authorizes an award of fees "having due regard to the merits and good faith of the suit or defense."

Although the language of § 9(e) makes an award of fees discretionary, the legislative history of this provision indicates that Congress included it to deter bad faith actions and "strike suits." S.Rep.No. 792, 73d Cong., 2d Sess. (1934); Loss, Securities Regulation 1836 *et seq.* (2d ed. 1961). In interpreting a substantially similar provision of the Civil Rights Act of 1964, the Supreme Court concluded that fees should be awarded "upon a finding that the plaintiff's action was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 421 (1978). The Court pointed out that to require less

---

**17.** 15 U.S.C. § 78i(e) in relevant part provides that in actions brought under § 9(a),

"the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant."

We note that plaintiff's § 9(a) claim was asserted only against the investor defendants. In view of our holding on the award of attorneys' fees in this case, it is unnecessary to consider whether plaintiff's limitation of his § 9(a) claim would bar the publishing defendants from being awarded fees under § 9(e). Moreover, since we affirm the judgment below insofar as it

awarded costs to the defendants-appellees under Fed.R.Civ.P. 54(d), it is not necessary to consider the question of costs under § 9(e).

**18.** Rule 11 in relevant part provides:

"The signature of an attorney [on a pleading] constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. . . . For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action . . . ."

would defeat Congressional efforts to promote vigorous enforcement of the statute, but to require more would be unnecessary, in view of the long-standing equitable power to award fees upon a finding of bad faith. *Id.* at 419–22.

■ We hold that the minimum standard for an award of fees under § 9(e) of the Exchange Act is that set forth in *Christianburg Garment,* i. e., the action must have been frivolous and without foundation. Since we have held that the instant action was not entirely without foundation, we decline to sanction the award of fees to the defendants-appellees under § 9(e). *See Dewitt v. American Stock Transfer Co.,* 433 F.Supp. 994 (S.D.N.Y.1977), *modified,* 440 F.Supp. 1084 (fee award under substantially similar provision of Exchange Act inappropriate where claim was not frivolous); *see also Acker v. Shulte,* 74 F.Supp. 683 (S.D.N.Y.1949); *accord, Stella v. Kaiser,* 83 F.Supp. 431 (S.D.N.Y.1949). In view of our holding, we need not consider whether a finding of bad faith also would be required for an award of fees under § 9(e). *See Colonial Realty Corp. v. Brunswick Corp.,* 337 F.Supp. 546 (S.D.N.Y.1971).

■ Rule 11 speaks in plainly subjective terms: the attorney's certification of a pleading is an assertion that "to the best of his knowledge, information, and belief there is good ground to support it. . . ." The standard under Rule 11, therefore, is bad faith. *See Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n,* 365 F.Supp. 975, 982–83 (E.D.Pa.1973); *see also Peter Kiewit Sons' Co. v. Summit Construction Co.,* 422 F.2d 242, 271 (8 Cir. 1969); *Levy v. Seaton,* 358 F.Supp. 1, 6 (S.D.N.Y.1973). Assuming arguendo that an award of attorneys' fees is a permissible sanction under Rule 11, our conclusion that the instant action was not without foundation and hence not commenced in bad faith necessarily precludes the award of such fees under Rule 11. *Miller v. Schweickart, supra,* 413 F.Supp. at 1061–62; *Brand v. Tisch,* 253 F.Supp. 122, 125 (S.D.N.Y.1966).

## V.

The district court also awarded costs to both the publishing defendants and the investor defendants pursuant to Fed.R.Civ.P. 54(d), which provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." [19] Appellants argue that this was error since appellees were not the prevailing parties. We disagree.

■ It is true that generally the defendant is not considered the prevailing party when, as here, there is a voluntary dismissal of the action by the plaintiff with prejudice. *Mobile Power Enterprises, Inc. v. Power Vac, Inc.,* 496 F.2d 1311, 1312 (10 Cir. 1974); *see generally* 6 Moore's Federal Practice ¶ 54.70[4] (2d ed. 1976).

■ Here, however, the stipulation and order of dismissal expressly reserved to defendants the right to move for "costs and disbursements of this action". Since appellants agreed to such a stipulation, we reject their claim that the reservation was inoperative from the moment of its entry. We affirm the district court's award of costs under Rule 54(d).

## VI.

■ As indicated above, the district court expressly declined to make any findings on the propriety of appellants' *conduct* of the litigation, as distinguished from their *commencement* of the action. 469 F.Supp. at 632 n.2. Although we hold that the action was commenced in good faith, we remand for determination by the district court (a) whether appellants' conduct of the litigation was intentionally dilatory; and (b) whether at any point, during the litigation and prior to dismissal, sufficient facts became available to appellants to demonstrate that a failure at that point to withdraw the action necessarily amounted to

---

19. Rule 54(d) in relevant part provides:

"(d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs. . . ."

bad faith. If the court finds that the litigation was conducted in good faith, that ends the matter and an order should be entered accordingly. If, however, the court finds that the litigation was conducted in bad faith, appellees' reasonable expenses resulting from such bad faith conduct by appellants should be assessed and an order should be entered accordingly. *See Browning Debenture Holders, supra,* 560 F.2d at 1088–89; *In re Boston & Providence R.R. Corp.,* 501 F.2d 545, 550 (1 Cir. 1974); 28 U.S.C. § 1927 (1976).

To summarize, we hold as follows:

(1) The action was commenced in good faith. Accordingly, we reverse the district court's award to the publishing defendants of $50,000 in attorneys' fees and expenses as assessed against appellants Nemeroff and Hale and Dorr; and we affirm the district court's denial of attorneys' fees and expenses to the investor defendants.

(2) We affirm the district court's award of costs under Rule 54(d) to the publishing defendants and the investor defendants.

(3) We remand to the district court for a determination of the propriety of appellants' conduct of the litigation.

(4) We order that taxation of costs in this Court in connection with the instant appeal and cross-appeal shall be held in abeyance pending the outcome of our remand to the district court and any ensuing appeal.

Affirmed in part, reversed in part, and remanded.