**Robert B. NEMEROFF, D.D.S.,
Plaintiff-Appellant,**

**Hale & Dorr, Appellant,**

**v.**

**Alan ABELSON, et al.,
Defendants-Appellees.**

**No. 559, Docket 82–7488.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 3, 1983.

Decided March 23, 1983.

---

Simon H. Rifkind, New York City (Robert S. Smith, Michael C. Lasky, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for appellants.

Michael B. Mukasey, New York City (Ellen M. Martin, Patterson, Belknap, Webb & Tyler, New York City, on the brief), for appellees Alan Abelson, Robert Bleiberg, and Dow Jones & Co., Inc.

Julius Berman, New York City (Kaye, Scholer, Fierman, Hays & Handler, New York City, on the brief), for appellee Meyer Berman.

Andrew C. Freedman, New York City (Reavis & McGrath, New York City, on the brief), for appellees Robert Wilson and Robert Wilson Associates.

Before TIMBERS, NEWMAN and PIERCE, Circuit Judges.

NEWMAN, Circuit Judge:

A prevailing defendant is entitled to an award of attorney's fees if a plaintiff brings or maintains an action without adequate factual basis and in bad faith. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). That rule must be applied with caution to make sure that plaintiffs are not deterred from suing to enforce their rights, especially when enforcement of those rights vindicates the Constitution or acts of Congress. At the same time, the rule must be applied in appropriate cases to spare members of the public from the expense of defending against baseless allegations. This appeal from an order of the District Court for the Southern District of New York (Robert L. Carter, Judge) awarding attorney's fees to defendants illustrates both our caution in administering the rule and our willingness to see it invoked when compelling circumstances warrant its use. In the unusual circumstances of this case, we affirm the District Court's order.

I.

On March 25, 1977, the Boston law firm of Hale & Dorr filed a class action on behalf of Robert Nemeroff, a shareholder of Technicare Corporation, against Alan Abelson, a columnist for *Barron's Business and Financial Weekly ("Barron's");* Robert Bleiberg, Abelson's editor; Dow Jones & Company, Abelson's publisher; and several investor defendants who were acquaintances of Abelson's. According to the complaint, the investor defendants had advance information about columns that Abelson wrote between May 1976 and February 1977 predicting a decline in the fortunes of Technicare Corporation. The complaint alleged that, based on their knowledge of the forthcoming columns, the investor defendants took short positions in Technicare stock. Once the columns were published, the price of Technicare stock allegedly declined and the investor defendants allegedly made substantial profits by covering their short positions.[1] On January 6, 1978, plaintiff amended his complaint to reverse the direction of the alleged wrongdoing: he now claimed that the investors induced Abelson to write negative articles to enhance their short positions in Technicare. Eleven months after filing the original complaint, Nemeroff and his attorneys agreed to discontinue the action. On May 3, 1978, the District Court signed a stipulation dismissing the complaint with prejudice and reserving for the defendants the right to seek reimbursement for attorney's fees. On June 14, the defendants notified the District Court that they would seek attorney's fees.

In its first opinion in this case, the District Court examined whether the plaintiff and his attorneys from Hale & Dorr instituted the suit in good faith with an adequate factual basis. *Nemeroff v. Abelson,* 469 F.Supp. 630 (S.D.N.Y.1979). After receiving documentary evidence, the Court

---

1. Previous opinions dealing with this litigation provide a more complete discussion of the facts of the case. *Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir.1980); *Nemeroff v. Abelson,* 94 F.R.D. 136 (S.D.N.Y.1982); *Nemeroff v. Abelson,* 469 F.Supp. 630 (S.D.N.Y.1979). Familiarity with these decisions is assumed.

concluded that at the time of filing, plaintiff and his attorneys lacked an adequate factual basis for suing either the publishing or the investor defendants. However, the Court found that Nemeroff and his lawyers acted in bad faith only as to the publishing defendants and not as to the investor defendants. The District Court awarded the publishing defendants $50,000 of their claim for attorney's fees, which exceeded $100,-000.

On appeal and cross-appeal, a panel of this Court disagreed with the District Court's conclusion that Nemeroff lacked an adequate factual basis for commencing the suit. *Nemeroff v. Abelson,* 620 F.2d 339 (2d Cir.1980). We noted that Nemeroff and his attorneys had two bases for suing the defendants. The first basis, which we labeled the "nuts and bolts" of the conspiracy, comprised circumstantial evidence consistent with the allegations: during the period covered by the complaint, Abelson had published several columns critical of Technicare Corporation; at the same time, there was an unusually high volume of short positions in Technicare stock; toward the end of the period and following one of Abelson's critical columns, the price of Technicare stock began to decline; finally, there were rumors in the financial community that certain investors, including some of the investor defendants, had profited in the past from advance information about the contents of Abelson's column.

Plaintiff's second basis for the suit was a conversation between one of plaintiff's attorneys and a lawyer from the New York Stock Exchange (NYSE). Plaintiff's attorney understood from this conversation that the NYSE was investigating trading in Technicare stock and had found a correlation between the dates of some of Abelson's columns and the dates of certain short sales of Technicare stock. The District Court had discounted this report of a correlation as a basis for the suit because, before the suit was filed, the plaintiff's attorney had learned from another NYSE official that the Technicare specialist at the NYSE had satisfied himself that there had been no manipulation of the company's stock.

On the first appeal, we concluded that Nemeroff's attorney was justified in relying on his initial conversation with the NYSE attorney at least until July 19, 1977, when the NYSE released a report dispelling any suspicion of impropriety based on a supposed Technicare-Abelson "correlation." Having decided that Nemeroff and his attorney had an adequate factual basis for *commencing* their suit, we reversed the District Court's award of attorney's fees. However, we remanded the matter to the District Court to consider whether defendants might nevertheless be entitled to attorney's fees if the District Court found either that Nemeroff's attorneys conducted the litigation in an intentionally dilatory fashion or that "during the litigation and prior to dismissal, sufficient facts became available to [plaintiff] to demonstrate that a failure at that point to withdraw the action necessarily amounted to bad faith." 620 F.2d at 350–51.

On remand, the District Court received additional documentary evidence pertinent to the two alternative grounds for fee awards suggested by our previous opinion and again awarded attorney's fees, this time to all of the defendants who requested them. *Nemeroff v. Abelson,* 94 F.R.D. 136 (S.D.N.Y.1982). The District Court first concluded that as of July 19, 1977, when the NYSE reported that it had found no evidence of a conspiratorial link between Abelson and the investor defendants, Nemeroff and his attorneys lacked an adequate factual basis for continuing the suit. The District Court then focused on the manner in which Nemeroff's attorneys conducted the litigation after July 19. Between July 1977 and the following May when the case was dismissed, Nemeroff's attorneys made only insignificant efforts to replace the "correlation" previously thought to have been uncovered by the NYSE with new evidence linking Abelson's columns to the trading of the investor defendants. During this nine-month period, Nemeroff's attorneys concerned themselves primarily with a motion for class certification and with requests for additional discovery time. The District

Court concluded that given the inadequate factual basis for the suit as of July 19, Nemeroff's attorneys had continued the litigation in bad faith by choosing to pursue peripheral, procedural issues after July 19 without making any perceptible effort to locate evidence that might support the complaint. The District Court also found plaintiff's conduct of the litigation to be intentionally dilatory.

The District Court concluded that the defendants were entitled to reasonable attorney's fees for work done after July 19, 1977, under either theory left open by our previous opinion. The District Court then awarded attorney's fees of $50,000 to the publishing defendants and a total of $26,000 to various investor defendants. Liability for the fee awards was imposed upon plaintiff and his attorneys.

## II.

The parties disagree as to what standard of review we should apply to the District Court's findings. As appellants note, the record before the District Court was entirely documentary. Although in the past this Circuit has applied virtually *de novo* review to documentary records, *see, e.g., Dopp v. Franklin National Bank,* 461 F.2d 873, 878–79 (2d Cir.1972), we believe that the District Court's findings in this matter deserve more deference. Here, the documentary evidence pertained to pretrial proceedings conducted before the District Court. The Court observed first hand the manner in which plaintiff's attorneys pursued discovery. The District Court had extensive familiarity with the controversy, and it has furnished us with a lucid opinion in elaboration of its findings. *See New York v. NRC,* 550 F.2d 745, 752 (2d Cir. 1977), *construed in Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 276 n. 9 (2d Cir.1981). Under these circumstances, we believe that the District Court's ruling should withstand appellate scrutiny unless appellants can either vitiate the Court's

critical factual findings or show that the decision to award attorney's fees in this case exceeded a reasonable and restrained exercise of discretion.

## A.

We turn first to the District Court's finding that Nemeroff's suit lacked an adequate factual basis after July 19. The release of the NYSE report on that date dealt a serious blow to Nemeroff's case. Appellants now downplay the importance of the NYSE's investigation, but in our previous opinion, we made clear that we found that investigation to be "[a]n important factor relied upon by [plaintiff's attorneys] in determining whether there was any basis for the charges against the publishing and investor defendants." 620 F.2d at 345. The correlation supposedly uncovered by the NYSE had supplied plaintiff with a crucial bridge between the acquisition of short positions in Technicare stock by the investor defendants and the publication of columns critical of Technicare Corporation by Alan Abelson. As long as they could rely on the NYSE correlation, Nemeroff and his attorneys might reasonably assume that the pattern of the investor defendants' trading, when juxtaposed with the publication of Abelson's columns, could alone support an inference of complicity.[2] Without the NYSE's correlation, however, Nemeroff and his attorneys had little reason to doubt the more obvious and completely innocent explanation for the occurrence of these two events at approximately the same time: Abelson and the investor defendants concurrently came to the realization—later proven true—that the stock market had overestimated the future profitability of Technicare Corporation.

Two days after the NYSE investigation was released, Nemeroff's case suffered a second setback. On July 21, 1977, defendants deposed Howard Roth, Nemeroff's stockbroker and one of the original sources of Nemeroff's suspicions about an Abelson-

**2.** We were willing to make that assessment of plaintiff's case solely for purposes of testing his good faith in filing the suit; we did not intimate any views on whether the case would have been sufficient to warrant consideration by a jury.

short trader connection. Roth revealed that he had no direct support for his previous statements that Abelson was leaking information to the investor defendants. He had simply inferred such an illicit liaison from his own interpretation of the Technicare ticker-tape activity. The loss of Roth as a potential witness severed one more line of evidence tying Abelson to the investor defendants in any actionable wrong.

Without the NYSE's correlation or Roth's testimony, Nemeroff and his attorneys had only three conceivable reasons to suspect that Abelson and the investor defendants were illegally entwined: contemporary press reports of similar prior contacts, a press report of a statement made by one of the investor defendants, and the trading records of the investor defendants.[3] We consider each of these factors.

Alan Abelson's relationship with the short trader community was a topic of press accounts in the mid-1970's. In 1975, *Business Week* published a story suggesting that Abelson had leaked information about his columns. Faced with a libel action filed by Abelson and his publisher, *Business Week* subsequently disclaimed the story and admitted that it had "no evidence that advance information on the contents of *Barron's* was intentionally leaked to investors by Abelson, *Barron's,* or Dow Jones." *Bus. Wk.,* July 12, 1976, at 30. While *Business Week* ultimately retracted its suggestive statements about Abelson, discovery during Abelson's aborted suit against the magazine established that Abelson once wrote a column criticizing International Systems & Controls (ISC), which may have been influenced by an anonymous tip supplied to Abelson. The tip, as it turned out, came from an investor holding short positions in ISC stock. The *Business Week* suit discovery also revealed instances in which members of the financial community seemed to have advance knowledge about what would appear in Abelson's columns. The individuals involved—none of whom was named as a defendant in Nemeroff's suit—could only predict that Abelson would criticize a particular company in a future column; they would not say precisely when the column would appear.

The relationship between Abelson and the financial community was also the subject of an article entitled "The Short Sellers and the Press," which appeared in the July 1977 issue of *Institutional Investor.* That article recounted the information uncovered during the *Business Week* suit discovery and also discussed Nemeroff's pending suit against Abelson. As part of its investigation, *Industrial Investor* interviewed Robert Wilson, one of the investor defendants in this case, about his dealings with Abelson. The interview was reported as follows:

> Asked whether he tried to use Abelson to promote his positions, Wilson responds, "I use everybody. I am always trying to get my longs up and my shorts down. So I am constantly using people. I feel perfectly free to tell Alan [Abelson] anything I have on my mind as long as it isn't inside information."

*Industrial Investor,* July 1977, at 30.

Appellants make much both of Wilson's bravado about his ability to use Abelson and the contemporary press reports linking Abelson to the financial community. Wilson's statement and the press accounts, they claim, corroborated the charges of illegal conduct alleged in Nemeroff's suit. We disagree. Nemeroff's suit claimed that investor defendants profited by trading in Technicare futures based on advance information about Abelson's columns. Neither the press accounts nor Wilson's statements revealed anything about Abelson's articles on Technicare or the investor defendants' trading in the company's stock. Moreover, nothing in the press accounts or Wilson's comments suggests that Abelson and anyone in the financial community were engaged in a conspiracy that involved profitable trading based on Abelson's columns.

 The press accounts and Wilson's statement surely suggest that Abelson and the financial community maintain a close relationship. But such a relationship is

---

3. Abelson's professional acquaintance with the investor defendants is of no legal significance.

hardly surprising. Both Abelson and the investor defendants make their living by searching for news about publicly traded companies. Abelson would naturally be expected to find members of the trading community to be fruitful sources of stories. Nor is it surprising that investors who trade in a company's stock based on calculations that the market has overrated or underrated the company would be willing and even eager to share their calculations with Abelson and other members of the press. Unsubstantiated rumors of such goings-on did not license Nemeroff and his attorneys to continue a suit against defendants under either their original theory, that Abelson leaked his columns about Technicare to the investor defendants, or their revised theory, that the investor defendants manipulated Abelson into writing the columns.

██ The only other evidence appellants had that could have justified their decision to continue the suit after July 19 were the records of the investor defendants' trading activities in Technicare stock, which were released to Nemeroff's attorneys in August 1977. The NYSE had examined these records before concluding that there was no direct evidence of conspiracy between Abelson and the investor defendants. However, the NYSE's conclusions did not bind Nemeroff and his attorneys, and they were entitled to analyze the records for themselves to determine whether the records evidenced a conspiratorial nexus between Abelson and the investor defendants.

As it turned out, the trading records did not produce evidence of a correlation between Abelson's columns and the investor defendants' trading, thereby leaving unfilled the gaping hole in Nemeroff's claim created by the NYSE report. The trading records reveal that many, but not all, of the originally named investor defendants held short positions in Technicare stock during the period covered by Nemeroff's complaint. But the records do not suggest a suspicious pattern of orchestrated trading. While Abelson apparently met with various investor defendants over the relevant peri-

od, the trading records do not indicate that the investor defendants' activities were influenced by those meetings or that their trading was timed to anticipate or capitalize upon Abelson's unfavorable columns about Technicare. Concededly, the records do reveal a few isolated instances when an investor defendant purchased a short position in Technicare stock before one of Abelson's columns appeared and then covered the position afterwards. In light of the heavy volume of the investor defendants' trading activity in Technicare short positions during the period, such coincidences were inevitable. In fact, for the most part, the trading records contradict Nemeroff's allegations in that the records show that certain investor defendants purchased short positions after Abelson's critical columns were already released when, according to Nemeroff's theory, these defendants should have been covering. The records also reveal that one investor defendant, Robert Wilson, never profited from Abelson's columns because he failed to cover his short positions throughout the entire period.

Appellants persist in arguing that the investor defendants' trading records gave a powerful boost to their case. Any inconsistencies between their theories of liability and the trading records, they claim, prove not that the conspiracy did not exist but only that "[c]onspirators do not always march in lock-step." Reply Brief for Appellants at 11. Having reviewed the trading records ourselves, we discern in them no choreography whatsoever, martial or otherwise.

In our previous opinion, we acknowledged that a claim was colorable as long as "a reasonable attorney could have concluded that facts supporting the claim might be established." 620 F.2d at 348 (emphasis deleted). As of July 1977, Nemeroff and his attorneys had only the most attenuated grounds for believing that they would be able to establish a conspiratorial relationship between Abelson and the investor defendants.[4] Their evidence centered directly

---

4. It is true that Nemeroff's attorneys had come

across no evidence conclusively exonerating

on the innocent fact that Abelson had published articles critical of Technicare at roughly the same time that some of the investor defendants were buying and covering short positions in the company's stock. Nemeroff and his attorneys had found no witness who could testify to facts indicating that Abelson and the investor defendants had acted in complicity. Moreover, the trading records, when matched with the publication dates of Abelson's articles, could not support an inference of wrongdoing and were, if anything, exculpatory for the defendants. The only evidence connecting Abelson to the investor defendants were various press reports that intimated, in general terms not related to Technicare, that Abelson had a cozy friendship with members of the financial community. On this record, we cannot fault the District Court for concluding that plaintiff lacked a colorable claim after July 1977.

## B.

■ Given the thinness of Nemeroff's case and the questionable origins of his suit,[5] the District Court was probably entitled to find bad faith solely because Nemeroff and his attorneys elected to pursue the matter for several months after July 19, when they should have realized that they had no support for their charges. Rather than award defendants their attorney's fees on this basis, however, the District Court

gave plaintiff the benefit of the doubt and withheld a finding of bad faith until it examined the course of the plaintiff's litigating activities after the key props of his suit had collapsed. Plaintiff faults the District Court for this approach, contending that the Court impermissibly fused the two possible theories—bad faith continuation of the suit and dilatory conduct of the litigation—that we had outlined on the prior appeal. We see no basis for complaint. Consistent with our mandate, the District Court explored the issue of intentional dilatoriness as a separate matter. But, in examining the issue of good faith continuation, the Court acted well within its discretion—and to the distinct advantage of the appellants—in affording Nemeroff and his attorneys an opportunity to demonstrate that whatever the deficiencies of their case on July 19, they acted promptly thereafter to probe for evidence that would justify continuing the litigation. The Court permitted them to support their protestations of good faith by pointing to any efforts to replace the anticipated NYSE correlation with new information linking Abelson to the investor defendants in wrongful conduct. Unfortunately for Nemeroff and his attorneys, there were no such efforts.

Between July and November 1977, Nemeroff's attorneys engaged in discovery limited to matters related to the class action motion.[6] Between November 1977 and May

Abelson and the investor defendants, but a claim does not remain colorable just as long as no such evidence is found. A colorable claim must be based upon some evidence from which an attorney can reasonably expect to build a case. We do not demand that attorneys come to court with their cases already proven, but we do require that they have some basis for invoking the judicial process and for continuing their lawsuits when promising evidence evaporates.

5. In our previous opinion, we implicitly ruled that any irregularities that surrounded the filing of Nemeroff's complaint were insufficient to establish that the suit was brought in bad faith, at least while a colorable basis for the suit existed. However, these irregularities legitimately influenced the District Court's conclusions about plaintiff's decision to continue the suit after July 19. Briefly put, there was evidence in the record suggesting that Nemer-

off's attorneys undertook this suit at the urging of, and possibly with financial support from, Herbert Stein, an investor who did not own Technicare stock but was annoyed at Abelson for columns he had written about another company in which Stein had an interest. The record indicates that Hale & Dorr may have acted on behalf of Nemeroff only because he happened to be a Technicare stockholder who was willing to go along with the suit. Moreover, there is evidence in the record that Nemeroff's attorneys encouraged the press to report on the suit as a means of intimidating Abelson. All of this evidence lends support to the District Court's conclusion that Nemeroff and his attorneys continued this suit in bad faith.

6. The parties had agreed at the outset of the litigation to direct discovery initially to the class action motion and only thereafter to the merits. While that course made sense as long

1978 when the suit was dismissed, their discovery amounted to less than half a dozen depositions of minor witnesses who possessed no first-hand knowledge of the disputed facts. Throughout the entire 13-month pretrial period, Nemeroff's attorneys failed to depose a single investor defendant or Alan Abelson or anyone who might have linked Abelson to the investor defendants.

We agree with the District Court that the pace of discovery can be an appropriate factor to consider in determining the state of mind of Nemeroff and his attorneys. Even if, as of July 1977, Nemeroff and his attorneys honestly but erroneously believed that their claims were still colorable, they must have appreciated that they had at best an extremely marginal case. In such a situation, we would expect Nemeroff's attorneys to make vigorous efforts to shore up their case, rather than to allow the matter to meander through pretrial procedures. Nemeroff's attorneys made no such efforts, and the District Court was entitled to take this lack of exertion as further evidence of bad faith.

We conclude that on the facts of this case the District Court was warranted in finding that Nemeroff and his attorneys continued this suit in bad faith after July 1977. We hasten to emphasize the limited nature of our holding. We uphold the District Court because its finding of bad faith continuation of this lawsuit is well supported by the particular circumstances of this record. We do not thereby create an easy test for the award of attorney's fees to a successful defendant. Plaintiffs who have a colorable basis for a claim and who act in good faith need not apprehend that defeat on the merits of their lawsuit will require them to pay their adversaries' legal fees. Nor do we mean to imply that a litigant is entitled to

attorney's fees whenever an opponent fails to conduct discovery at full speed.[7] In this case, the pace of discovery was just one factor that contributed to the District Court's finding of bad faith. Far more important was the fact that Nemeroff and his attorneys chose to keep Abelson and the investor defendants in court without an adequate factual basis behind the case.

Because we affirm the District Court on its finding that this suit was continued without colorable claims and in bad faith, we need not reach the Court's alternative holding that Nemeroff's attorneys prosecuted the case in an intentionally dilatory fashion.

### III.

As a final matter, appellants complain that the law of the case barred the District Court from awarding attorney's fees to the investor defendants, even if an award to the publishing defendants was proper. Appellants' point out that the District Court had denied the investor defendants any attorney's fees in its first decision and further contend that we upheld that denial on the first appeal.

Appellants' argument is without merit. On the prior appeal, the investor defendants cross-appealed from the denial of an award of their attorney's fees. While our previous opinion did not expressly rule on the investor defendants' cross-appeal, we remanded the case to the District Court to determine whether "appellees' reasonable expenses resulting from [the] bad faith conduct by appellants should be assessed." 620 F.2d at 351. In other parts of that opinion, we distinguished between investor appellees and publishing appellees when necessary. The District Court correctly understood that, by remanding for a determination as

as plaintiff had a colorable basis for maintaining the suit, once the basis for the suit evaporated, the plaintiff and his attorneys acted at their peril in not seeking leave, if such was required, to discover facts warranting continuation of the suit.

7. In the ordinary case brought to vindicate colorable claims, leisurely discovery will justify attorney's fees only if it entails an intentionally dilatory tactic. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–67, 100 S.Ct. 2455, 2463–65, 65 L.Ed.2d 488 (1980).

to "appellees," we left the District Court free to consider awarding attorney's fees to the investor defendants as well as the publishing defendants. The District Court was therefore entitled to award attorney's fees to all the appellees, including the investor defendants, once the Court had concluded that Nemeroff and his attorneys had continued the litigation against them in bad faith and without colorable claims.[8]

The order of the District Court is affirmed.

---

8. We have implied in this opinion that Nemeroff's attorneys may have been justified in continuing this action for perhaps a few weeks after the NYSE report was released in order to assess the impact of the report and to make their own analysis of the investor defendants' trading records. Therefore, strictly speaking, it may be incorrect to say that the suit should have been discontinued precisely on July 19, 1977. However, this technicality has no effect on the District Court's fee award. The District

Court calculated its award in a conservative fashion, awarding defendants far less than they actually spent on their defense. The $50,000 awarded to the publishing defendants should be compared to the $98,925 they claimed for expenses incurred after July 19, 1977. The aggregate award to all appellees of $76,000 would be reasonable even if Nemeroff's attorneys had cause to continue the suit as late as the end of August 1977.