McHugh, J.
I. BACKGROUND
This is an action in which the plaintiff, Dr. Omar Jaraki, seeks to recover damages from the defendants for what he claims was their concerted and discriminatory effort to have him discharged from his employment relationship with Spectrum Emergency Care, Inc. (“Spectrum”) and Gatewood Associates, P.C. (“Gate-wood”) because of his ethnic origins. The present proceedings arise out of an ex parte motion plaintiff filed on March 3, 1995 in which he sought a temporary restraining order against the defendants, against the law firm of Taylor, Anderson & Travers and against a United States District Judge to restrain them from “communicating by any means with Leo Rozenbaum, M.D., a witness in the [this] action.” The ex parte motion also sought a short order of notice and, ultimately, a preliminary injunction of the same tenor. The motion was supported by an affidavit signed by Dr. Jaraki.
In addition to opposing plaintiffs motion, defendants filed a motion to strike Dr. Jaraki’s Affidavit, a motion for sanctions and a motion to impound the motion and allied papers. Dr. Rozenbaum filed a motion to quash a subpoena served on him and his own motion for sanctions. The essential and fundamental basis for those motions is that plaintiffs motion and affidavits are false, wholly without color, scandalous and impertinent.
In order to put the various contentions of the parties, and the papers they have filed, in their proper contexts, it is necessary to provide a little more background than is generally necessary and to begin, as it were, at the beginning.
A. FACTUAL ALLEGATIONS IN THE UNDERLYING ACTION
Essentially, plaintiff claims that he was impermis-sibly discharged from his employment with Gatewood and Spectrum in February of 1993. At the time, plaintiff was working as an emergency-room physician at Melrose/Wakefield Hospital. For reasons not here material, his discharge from Gatewood and Spectrum signaled the end of his ability to work as an emergency-room physician at Melrose/Wakefield Hospital. Plaintiff contends that officials of the Melrose/Wakefield Hospital instigated his termination from Gatewood and Spectrum because of their ethnic bias against him. To cover up that ethnic bias, however, Dr. Jaraki claims that the officials fabricated incidents of dereliction of duty and sexual harassment on his part and then used those fabricated incidents as a pretext for instigating his discharge.
In February of 1993, Dr. Jaraki was also employed as an emergency-room physician at Quincy City Hospital. There, he had struck up an acquaintance with Dr. Rozenbaum, an immigrant from the Soviet Union, who also worked as an emergency-room physician at the Hospital, although on a different shift.
In February of 1993, Quincy City Hospital had a contract with Paradigm, Inc., a professional corporation, to provide the hospital’s emergency-room coverage. Paradigm employed all of the doctors, including Dr. Jaraki and Dr. Rozenbaum, who worked in the emergency room. Paradigm was slow to pay its employee doctors. Consequently, by the late spring of 1994, several of the Paradigm doctors had become became so dissatisfied with Paradigm that they began plans to form a corporation of their own that would replace Paradigm as the Hospital’s provider of emergency-room coverage.
Dr. Jaraki claims that the Paradigm employees who were planning to form the new corporation asked him to join that corporation and become a shareholder in it. In connection with ensuing discussions on that subject, Dr. Jaraki claims that he discussed with Dr. Rozenbaum the likelihood that any contract between a new corporation and the Quincy City Hospital would require all employees of the new corporation, including those who previously had been employed by Paradigm, to undergo a “reaccreditation” process. During the course of that reaccreditation process, Dr. Jaraki claims, he would have been forced to reveal to Quincy City Hospital officials the allegations of misconduct leveled against him at the Melrose/Wakefield Hospital, allegations that, as stated, he says the Melrose/Wakefield Hospital staff fabricated to camouflage their ethnic bias. Because of what he claims was his fear that revelation of those allegations would destroy his chances to work at Quincy City Hospital and his career as well, Dr. Jaraki claims that he elected to leave Quincy City Hospital and take a fellowship in cardiology at St. Louis University in Missouri. He further claims that he now earns far less as a cardiology fellow in Missouri than he would have earned had he continued to work both at Melrose/Wakefield and at Quincy City Hospital. The damages he seeks in this action include the difference between what he now earns and what he claims he would have earned had he continued to work at both hospitals.
B. THE CONTENTS OF THE AFFIDAVIT
In the affidavit that accompanied his ex parte motion for a temporary restraining order, Dr. Jaraki claimed that “Dr. Rozenbaum has all the information concerning why I ultimately had to leave Quincy [City Hospital].” Then followed the pertinent and material paragraphs of Dr. Jaraki’s affidavit:
*379 5. I have had several conversations with Dr. Rozenbaum regarding him testifying as to the above facts regarding Quincy. He told me on many occasions of the above stated facts regarding the change of Emergency Room Management/Ownership at Quincy, and what likely affect [sic] same would have upon my ability to continue to work their [sic] as above stated, [sic] Dr. Rozenbaum had stated to me several times that he would be willing to testify on my behalf in my lawsuit.
6. On January 9, 1995, however, I again spoke with Dr. Rozenbaum on the telephone. He informed me that he had recently received a letter from his attorney, Diane Taylor. According to Dr, Rozenbaum, Ms. Taylor represents him in two legal matters totally unrelated to my cases.
7. Ms. Taylor is an Senior Partner and Principal in the Law Firm of Taylor, Anderson & Travers. Ms. Taylor’s law partner at Taylor, Anderson & Travers, is James Anderson.
8. Mr. Anderson and his firm, Taylor, Anderson & Travers, represent defendants, Gatewood Associates, P.C., Spectrum Emergency Care, Inc., and Joseph Gatewood, M.D., in this lawsuit . . . and defendants Gatewood Associates, P.C., Spectrum Emergency Care, Inc., Joseph Gatewood, M.D., and Richard Giest, M.D., in [a related lawsuit].
9. Dr. Rozenbaum informed me that the above letter from Ms. Taylor essentially stated that because of a “[conflict of interest]” she would not be able to defend him in the above two legal matters if he elected to testify against “their client,” “Mel-rose/Wakefield Hospital.” Ms. Taylor also stated that if Dr. Rozenbaum testified, he would have to reveal his entire “past” and answer “all the questions” they put to him.
10. According to all papers filed in my two pending lawsuits, Taylor, Anderson & Travers are not the lawyers for Melrose/Wakefield Hospital. In fact, Peabody & Brown are.
11. As a result of this letter from Ms. Taylor, Dr. Rozenbaum then informed me that he had “changed his mind” and would not agree to testify on my behalf until he had a chance to discuss this issue with his lawyers in approximately “ten days.”
12. Approximately three weeks ago, I again spoke with Dr. Rozenbaum. He then claimed that he had met Attorney Taylor. He then told me that he would absolutely would not be a witness in my case. He also told me that he was informed by Ms. Taylor that the “Melrose/Wakefield” case is very important to Taylor, Anderson & Travers, and that it would be “[unethical and unprofessional for him to testify against his own lawyer].” Furthermore, Dr. Rozenbaum then told me that he had promised Ms. Taylor that, in the event he were subpoenaed to court to testify, that he would claim that he did not remember anything about this Jaraki situation.
13. During the above said conversations, Dr. Rozenbaum also told me that his lawyer in the past had been new federal judge “[Nancy] Gertner” (U.S.D.C., D. Mass.). Dr. Rozenbaum told me that he had also met with Judge Gertner after he received the letter from Ms. Taylor (approximately the last week in January). Dr. Rozenbaum said that he believed that Judge Gertner and Taylor were friends.[1] Dr. Rozenbaum said that Judge Gertner told him that it was “[unethical to witness against your own lawyer]” and that “he should not testify [in the above regard].”
14. I again spoke with Dr. Rozenbaum on May 1, 1995.1 tried to explain to him that Taylor, Anderson & Travers were not the lawyers for Melrose/Wakefield Hospital, but he was convinced that this was so.
15. Dr. Rozenbaum immigrated from Russia, has expressed to me how afraid he was to testify in this matter because his lawyers will bring up his other lawsuits while he was on the witness stand, and that same [sic] will hurt his career. His position now is to “forget” everything he knows because it would be “unethical” for him to go against “Melrose/Wake-field Hospital’s” (and his own) lawyers.
C. THE ALLEGATIONS OF THE MOTION
That affidavit provided the backdrop against which Dr. Jaraki’s attorney, Matthew Cobb, Esq., made a number of allegations in the motion itself. Among those were the following:
3. It has . . . come to the attention of undersigned counsel that a key witness in these actions, Leo Rozenbaum, M.D., has been approached by Diane Taylor, Esq., a Principal and Senior Partner in the law firm of Taylor, Anderson & Travers for the purpose of suborning peijury in the Trial of these matters . . .
6. Essentially Attorney Taylor lied to Dr. Rozenbaum, to whom she owes a fiduciary duty of utmost loyalfy and good faith, by telling him that her Arm represents codefendant, Melrose/Wake-field Hospital, in this action.
9. Furthermore, Dr. Rozenbaum has told Dr. Jaraki that he also had met with his prior attorney, United States District Judge, Nancy Gertner, concerning anticipated upcoming testimony in this matter . . . Again, because Dr. Rozenbaum has told a third party, Dr. Jaraki, about said conversation, no attorney-client privilege between Dr. Rozenbaum and Judge Gertner remains regarding this conversation. During said conversation, Dr. Rozenbaum was told, again, that it was “[unethical to witness against your own lawyer]” and that “he should not testify [in the above regard].”
*380 D. PRIOR ACTION ON THE MOTION
When presented with the foregoing motion, I denied Dr. Jaraki’s request for at ex parte temporary restraining order, issued a short order of notice returnable March 7, 1995 and ordered that the motion and the affidavit be impounded because of the nature of the allegations they contained.
Mr. Cobb caused the short order of notice to be served not only on the parties to this action but also on Dr. Rozenbaum and Judge Gertner.[2] The subpoena commanded Dr. Rozenbaum to appear at the March 7th hearing and to bring with him “the correspondence from Diane Taylor, Esq. to Leo Rozenbaum, M.D. referenced in the January 9, 1995 telephone conversation between Leo Rozenbaum, M.D. and Omar Jaraki, M.D.”
Dr. Rozenbaum did not appear on March 7 but, through counsel, filed a motion to quash the subpoena. That motion was supported by Dr. Rozenbaum’s own affidavit. In his affidavit, Dr. Rozenbaum asserted, among other things that he had “no personal knowledge about the facts and circumstances of Omar Jaraki’s work at Melrose/Wakefield Hospital and had never worked with him at that facility.” Dr. Rozenbaum said in his affidavit that he told Dr. Jaraki that he could not be a witness in this case because he knew nothing about the circumstances of Dr. Jaraki’s separation from Mel-rose/Wakefield Hospital and that he had personally told Mr. Cobb the same thing. Dr. Rozenbaum continued his affidavit by stating that, after speaking with Mr. Cobb, he had received a letter from his personal attorney stating that Dr. Jaraki had listed him as a witness in Dr. Jaraki’s case. Dr. Rozenbaum said that he did not understand
anything in said letter to be an attempt to prevent [him] from testifying in Dr. Jaraki’s case, nor did [he] understand that letter as a threat to disclose any confidential information relating to other matters if [he] testified in Dr. Jaraki’s case.
After receiving the letter, Dr. Rozenbaum’s affidavit said, he talked to Dr. Jaraki and told him that he was upset to find himself listed as a witness. In response, Dr. Rozenbaum said, Dr. Jaraki told him that he had been listed by mistake without Dr. Jaraki’s knowledge and that Dr. Jaraki would “telefax a letter to his attorney instructing him to remove [Dr. Rozenbaum] from the witness list.” Dr. Rozenbaum’s affidavit continued by stating that he did not know any person named “Diane Taylor” and that he did not have any letters from her.
Finally, Dr. Rozenbaum’s affidavit said that he had not discussed Dr. Jaraki with Judge Gertner and that he had never met with his personal counsel to discuss Dr. Jaraki. Dr. Rozenbaum concluded with the statement that “[t]he only information I know about Omar Jaraki’s situation is the information which he himself has told me, all of which was communicated after he left work at Quincy Hospital.”
Faced with those conflicting affidavits, I set the matter down for an evidentiary hearing on March 17, 1995. On the date of the hearing, all defendants filed motions for sanctions, a motion to strike Dr. Jaraki’s affidavit of March 3, 1995 and a motion to extend the orders of impoundment. All of those motions are now pending before the court.
II. FINDINGS OF FACT
Based on the testimony presented at the hearing, the exhibits there introduced and the reasonable inferences drawn from that evidence, I find and conclude as follows:
Leo Rozenbaum, M.D., met Omar Jaraki, M.D., in the Quincy City Hospital emergency room in 1993 when both were working there, albeit on different shifts. They became professional acquaintances and ultimately friends. Dr. Rozenbaum emigrated from the Soviet Union to the United States some years ago and, although his English is very good, his accent sometimes requires very careful listening in order to avoid misunderstandings. Dr. Jaraki was born in Syria and his native tongue is Arabic. He, too, speaks English well but, like Dr. Rozenbaum, his accent sometimes produces the need for careful attention in order to avoid misunderstandings.
In the late spring of 1994, Dr. Rozenbaum and several other physicians working at the Quincy Ciiy Hospital emergency room began to discuss the possibilify of forming a new professional corporation to replace Paradigm, Inc., the professional corporation that had been providing services to the emergency room and that employed all emergency-room physicians who worked at the Hospital.[3] When those discussion began, Dr. Rozenbaum did not know whether or not Dr. Jaraki would be a part of the new group. Indeed, approximately one month before Dr. Rozenbaum and his colleagues began to discuss formation of the new group, Dr. Rozenbaum learned that Dr. Jaraki intended to pursue studies at the Universiiy of Missouri.
Before Dr. Jaraki left the Quincy City Hospital in July of 1994, under circumstances that will be described in a few moments, Dr. Rozenbaum did not talk with him about events that had occurred at the Mel-rose/Wakefield Hospital and did not discuss the accreditation process that Dr. Jaraki might have to go through for him to remain at the Quincy City Hospital. After Dr. Jaraki left Quincy City Hospital and commenced this action, however, Dr. Jaraki visited with Dr. Rozenbaum at Dr. Rozenbaum’s home. During the visit, Dr. Jaraki discussed with Dr. Rozenbaum his Melrose/Wakefield tenure. In the course of that conversation, Dr. Jaraki told Dr. Rozenbaum that he believed he had been driven out of Melrose/Wakefield Hospital because of ethnic bias on the part of Mel-rose/Wakefield administrators. He also told Dr. Rozenbaum that he had left the Quincy City Hospital emergency room because he feared the accreditation process through which he might have to go if he remained at that Hospital.
*381 Dr. Rozenbaum gave Dr. Jarató a sympathetic ear. Moreover, Dr. Rozenbaum told Dr. Jarató that he had consulted with Nancy Gertner, Esq., on a discrimination matter and that, as far as he was concerned, Ms. Gertner was the best discrimination lawyer in the area. He told Dr. Jarató that, if he had concerns about discrimination, he should consult with Ms. Gertner.[4]
More conversation between Dr. Jarató and Dr. Rozenbaum ensued. Ultimately Dr. Jarató asked Dr. Rozenbaum if Dr. Rozenbaum would be a witness at the trial of this case. Dr. Rozenbaum told Dr. Jarató that he would not be a witness at trial because he did not know any of the facts concerning the relationship between Dr. Jarató and the Melrose/Wakefield Hospital administration. Beyond that, Dr. Rozenbaum told Dr. Jarató that he was extremely reluctant to go into any court in the Commonwealth because of his fear of courts in general and because he had some matters of his own pending in the courts. In sum and in essence, Dr. Rozenbaum told Dr. Jarató that courts were not a place where he wished to appear and that he believed he could contribute nothing to Dr. Jaraki’s case. After hearing Dr. Rozenbaum, Dr. Jarató asked him if he would nevertheless agree to speak to Mr. Cobb. Dr. Rozenbaum agreed to do so
Dr. Rozenbaum thereafter had several telephone conversations with Mr. Cobb. During the course of those telephone conversations, Dr. Rozenbaum told Mr. Cobb that he thought he had nothing to contribute to Dr. Jaraki’s case. He did not give Mr. Cobb any substantive information about Dr. Jaraki’s relationship with the Melrose/Wakefield Hospital. He may have discussed with Mr. Cobb a periodic reaccreditation process required of all individuals who had staff privileges at the Quincy City Hospital and he may have discussed the plans formulated in the late spring and early summer of 1994 with respect to creation of a new professional practice group to take over operation of the Quincy City Hospital emergency-room practice.
In any event, Mr. Cobb at some point filed answers to interrogatories in which he listed Dr. Rozenbaum as a witness. Those answers to interrogatories were sent to the firm of Taylor, Anderson & Travers (‘Taylor, Anderson”) which represents defendants Gatewood Associates, P.C., Spectrum Emergency Care, Inc. and Joseph Gatewood in this action.
Taylor, Anderson & Travers also represents Dr. Rozenbaum with respect to an action pending against him individually. The Taylor, Anderson partner who has represented, and does represent, Dr. Rozenbaum individually is Ellen Epstein Cohen, Esq. Ms. Cohen has no responsibility for defense of any claim asserted in this case or in any related case commenced by Dr. Jarató against the same defendants. Defense of Gate-wood Associates, P.C., Spectrum Emergency Care, Inc. and Joseph Gatewood in this case and in a related case has been entrusted to Taylor, Anderson partner James Anderson. There is no lawyer at Taylor, Anderson or anywhere else in the Commonwealth of Massachusetts, named Diane Taylor, although a “Dianne E. Taylor, Esq.” works for the City of Boston law department. No lawyer named Diane Taylor has ever been employed by Taylor, Anderson. No lawyer named “Diane” and no female lawyer named ‘Taylor’’ is, or has been, employed by Taylor, Anderson. No such lawyer was listed on the Taylor, Anderson letterhead Mr. Anderson used in all of his written communications with Mr. Cobb. No such lawyer is listed in Martindale Hubbell, the MCLE Lawyers’ Diary or the “Redbook,” three common and readily-accessible sources for Massachusetts attorney listings.
After the interrogatory answers were served,-it came to Ms. Cohen’s attention that Mr. Cobb had listed Dr. Rozenbaum as a witness. As a consequence, on or about January 19, 1995, Ms. Cohen sent Dr. Rozenbaum a letter stating that Dr. Jarató had identified him as a potential witness in this case. Ms. Cohen’s letter, a copy of which was introduced at the hearing before me after Dr. Rozenbaum’s limited waiver of any privilege with which that letter might otherwise be encumbered, also enclosed the relevant interrogatory answer. Ms. Cohen’s letter went on to say the following:
While I have not discussed with my partner Jim Anderson any confidential information concerning my representation of you in the [elided][5] matter, the fact that you may be a fact witness in another matter in which he represents an opposing party to one that may call you as a witness, could create a potential conflict were Attorney Anderson to have to cross-examine you. To evaluate whether or not such a potential conflict may exist, I need to inquire whether anyone has contacted you with respect to your being a potential witness in Dr. Jaraki’s lawsuit, and if so, what your intentions are in that regard. While my partner Jim Anderson has advised me that he cannot anticipate, under the current state of the facts, his having to cross-examine you in this matter, we need to know whether or not there is a possibility that that situation may arise and take the appropriate steps to insure that there is no conflict of interest.[6]
Upon receiving Ms. Cohen’s letter, Dr. Rozenbaum was incensed because he had told Dr. Jarató that he did not want to be a witness and had nothing to contribute. He and Dr. Jarató spoke on the telephone about the interrogatory answers and Dr. Rozenbaum expressed to Dr. Jarató his strong feelings on the matter. Dr. Jarató told Dr. Rozenbaum that his name had been placed on the witness list by mistake and that he would take steps to ensure that it was removed promptly. At no time did Dr. Rozenbaum tell Dr. Jarató that he had spoken to Judge Gertner about the matter or that he had promised his lawyers, or anybody else, that he would forget everything he knew about Dr. Jaraki’s relationship with the Quincy City Hospital emergency room in the event that Dr. Jarató persisted in subpoenaing him to court to testify. Dr. Jaraki’s *382 affidavit and his in-court testimony to the contrary are simply false and were known by Dr. Jaraki to be false when he made them.[7]
Although those findings are sufficient to deal with the present controversy’s center of gravity, certain findings having to do with discovery conducted in the case, and therefore with what both Mr. Cobb and Dr. Jaraki knew at the time Dr. Jaraki’s affidavit and motion were filed, are important for an understanding of the conclusions that follow.
Discovery in this case, discovery Mr. Cobb has handled from the outset, reveals that Dr. Jaraki was terminated from the Melrose/Wakefield Hospital in February of 1993. After a “credentialing” process during which he claims to have disclosed the circumstances surrounding his termination from Melrose/Wakefield Hospital, Dr. Jaraki was hired for emergency-room work at the Lawrence General Hospital in August of 1993.[8] He was asked to, and did, resign from the Lawrence General Hospital in January of 1994.[9]He left Quincy City Hospital on July 3,1994. While simultaneously working at Quincy City Hospital and either Lawrence General Hospital or Mel-rose /Wakefield Hospital, Dr. Jaraki’s income was substantially in excess of $200,000 per year.
For a long time before he left Quincy Cily Hospital, however, Dr. Jaraki had been interested in pursuing a research fellowship. Indeed, he began obtaining letters of recommendation for fellowship programs as early as January of 1992, almost thirteen months before he was terminated from Melrose/Wakefield Hospital. He began to pursue fellowships with greater intensity as the months progressed and actually applied for the University of Missouri fellowship he ultimately accepted before he was hired to work in the Lawrence General Hospital in August of 1993.[10]
In early 1994, Dr. Jaraki was offered the University of Missouri fellowship. On February 11, 1994, he signed a letter that he understood would bind him contractually to attend the University of Missouri when and if it were countersigned by a University of Missouri official. Dr. Jaraki received a countersigned copy of that letter in early March 1994. When he received that copy, Dr. Jaraki believed that there was a binding contract between himself and the University of Missouri under which he was to attend the fellowship program. That fellowship program, as Dr. Jaraki well knew, started on or shortly after July 5, 1994. Dr. Jaraki thus made his contractual offer to the University of Missouri almost three full months before learning of any discussion at the Quincy City Hospital regarding formation of a professional corporation to replace Paradigm.[11]
Finally, Dr. Jaraki testified, in essence, that he withdrew from Quincy City Hospital rather than undergo the “recredentialing” process that inevitably would attend a transfer of functions from Paradigm to a new entity. He maintains that Dr. Rozenbaum’s knowledge of the transfer-generated “recredentialing” process and Dr. Jaraki’s concern about the potential consequences of that process made Dr. Rozenbaum’s testimony critical to the damage claims he is asserting in this case. In fact, however, Dr. Jaraki knew that Quincy City Hospital routinely required all physicians at the Hospital to undergo a “recredentialing” process every two years. He also knew that his next “recredentialing” at the Hospital therefore would occur in November of 1994 whether Paradigm remained or was replaced.
All of that was known both to Dr. Jaraki and to Mr. Cobb at the time Mr. Cobb listed Dr. Rozenbaum as a witness in this case and at the time that Mr. Cobb described his damage theory in his answers to interrogatories.
Although, Mr. Cobb did not in fact believe that Dr. Jaraki’s affidavit was false at the time he filed it, before filing the affidavit he conducted no inquiry at all to determine its truth. See Tr. 240-45.[12] Given the actual knowledge Mr. Cobb had at the time he filed the motion and the information available to him with only the most minimal of effort, no reasonable attorney would have concluded that facts supporting the motion might be forthcoming at an evidentiary hearing.
III. APPLICABLE LAW
Resolution of the two motions for sanctions pending before the court will illuminate the appropriate resolution of the other motions. It is appropriate, therefore, to focus first on those motions.
The motions for sanctions potentially call upon three separate, but related, sources of the court’s power to control proceedings before it. The first of those is G.L.c. 231, §6F, a statute that allows a court under certain circumstances to award costs and fees. That statute, however, applies only when the court determines that “all or substantially all of the claims, defenses, setoffs or counterclaims . . . were wholly insubstantial, frivolous and not advanced in good faith.” The text of §6F is focussed on claims asserted in the pleadings, not on assertions in individual motions or other isolated filings that occur during the course of processing the action. Moreover, the sanctions the statute describes may not be imposed for an isolated instance of conduct but are available only when bad-faith, insubstantial frivolity permeates the pleadings. See generally, e.g., Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 782 (1986). Finally, the statute plainly limits the remedies it affords to “parties” to an action and thus affords no avenue of relief for Dr. Rozenbaum. For all of those reasons, I am of the opinion that §6F provides no power to the court to award sanctions with respect to Dr. Jaraki’s motion in this case.
A second source of power, Mass.R.Civ.P. 11(a), provides that “(t]he signature of an attorney to a pleading constitutes a certificate by him [or her] that he [or she] has read the pleading; that to the best of his [or her] knowledge, information, and belief there is a good ground to support it; and that it is not interposed for delay.” Although Rule 11(a), by its terms, *383 applies only to “pleadings,” Rule 7(b)(2) provides that “(t]he rules applicable to captions, signing, and other matters of form of pleadings apply to all motions and other papers provided for by these rules.” The provisions of Rule 11(a) thus apply to all motions signed by an attorney. Bird v. Bird, 24 Mass.App.Ct. 362, 367-68 (1987). Rule 11(a), however, is inapplicable to clients.
Although Rule 11 does not require an extensive investigation before a signed paper is filed, the Rule does impose “ ‘an obligation on attorneys in this Commonwealth to ensure that sham pleadings are not employed,’ Community Nat'l Bank v. Dawes, 369 Mass. 550, 557 n.6 (1976), and that pleadings be based upon a ‘reasonable inquiry and an absence of bad faith.’ Bird v. Bird, 24 Mass.App.Ct. 362,368 (1987).” New England Allbank for Savings v. Rouleau, 28 Mass.App.Ct. 135, 140-41 (1989). “Bad faith” in this context is not extensively discussed in the cases. Consideration of desirable symmetry and consistent application of rules drawn from different sources, however, persuades me that the term should be given the same meaning as it has been given in the context of the court’s inherent power to award sanctions, a power discussed below.
Insofar as sanctions are concerned, Rule 11(a) states that “[f]or a willful violation of this rule an attorney may be subjected to appropriate disciplinary action. Similar action may be taken if scandalous or indecent matter is inserted.” Costs and attorneys fees may be awarded as well. See Callahan v. Board of Bar Overseers, 417 Mass. 516, 519 (1994).
A third source of the court’s power is the
exceptional power to shift fees where an action has been commenced or conducted “in bad faith, vexatiously, wantonly or for oppressive reasons.”
Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980). Because the underlying rationale for fee shifting is punishment of those who abuse the judicial process, Hall v. Cole, 412 U.S. 1, 5 (1973), and not deterrence of appropriately zealous advocacy, San Juan Products, Inc. v. San Juan Pools of Kansas, Inc., 849 F.2d 468, 476 (10th Cir. 1988), the “bad faith” fee-shifting exception to the general rule should be employed only in exceptional cases. Id.; accord Shimman v. International Union of Operating Engineers, Local 18, 744 F.2d 1226, 1229 (6th Cir. 1984); Eureka Investment Corp. v. Chicago Title Ins. Co., 743 F.2d 932, 946 (D.C. Cir. 1984); United States v. Standard Oil Co., 603 F.2d 100, 103 (9th Cir. 1979). Consequently, several federal appellate courts have concluded that “[t]he standards for bad faith [as a justification for an award of attorneys fees] are necessarily stringent.” Batson v., 805 F.2d 546, 549 (5th Cir. 1986); see Nepera Chern, Inc. v. Sea-Land Serv., Inc., 794 F.2d 688, 702 (D.C. Cir. 1986); cf. Brown v. Sullivan, 916 F.2d 492, 495 (9th Cir. 1990) (noting that bad faith exception is “a narrow one,” usually invoked to curtail “vexatious, wanton, or oppressive conduct”).
Although, no Massachusetts decision has squarely defined “bad faith” for purposes of shifting fees, the United States Court of Appeals for the Second Circuit, in an opinion generally followed throughout the federal system, has held that a finding of “bad faith” in the present context requires a showing that the claims are:
entirely without color and made for reasons of harassment or delay or for other improper purposes.
A claim is colorable, for the purpose of the bad faith [fee shifting doctrine], when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim . . . The question is whether a reasonable attorney could have concluded the facts supporting the claim might be established, not whether such facts actually had been established.
Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980). Accord Hirshfeld v. Board of Elections, 984 F.2d 35, 40 (2d Cir. 1993). The test is conjunctive. Neither meritlessness nor improper motive, standing alone, will support an award of attorneys fees under the Second Circuit’s formulation. Colombrito v. Kelly, 764 F.2d 122, 132 (2d Cir. 1985). See generally Beaudry Motor Co. v. ABKO Properties, Inc., 780 F.2d 751, 756 (9th Cir. 1986) (bad faith found where claim not colorable and plaintiff instituted action for an improper purpose); San Juan Products v. San Juan Pools of Kansas, Inc., supra, 849 F.2d at 476 (adopting Second Circuit test); Ford v. Temple Hospital, 790 F.2d 342, 347 (3d Cir. 1986) (bad faith constitutes intentional assertion of a frivolous contention for an ulterior purpose); Actors’ Equity Ass’n v. American Dinner Theater Institute, 802 F.2d 1038, 1043 (8th Cir. 1986) (adopting the Third Circuit’s view as expressed in Ford); Glick v. Koenig, 766 F.2d 265, 270 (7th Cir. 1985) (bad faith found where plaintiff asserted merit-less claim for the purpose of harassment and retaliation); Badillo v. Central Steel & Wire Co., 717 F.2d 1160, 1165 (7th Cir. 1983) (award of attorneys fees for bad faith proper only if the court finds both that the litigant acted with subject of bad faith and that the claim or motion lacked probable cause); Peltier v. Peltier, 548 F.2d 1083, 1084 (1st Cir. 1977); (precondition to finding bad faith is an “intentional institution of an action which one knows to be fictitious and wholly without merit and which is done for the specific purpose of frustrating and harassing lawfully instituted legal procedures”).
An individual’s belief that his or her actions were proper or an attorney’s belief that his or her client’s version of the facts was true will not necessarily prevent a finding of bad faith. See Gordon v. Helman, CCH Federal Securities Law Reporter 198328 (N.D. Ga. 1983); Davidson v. Allis Chalmers Corp., 567 F.Supp. 1532, 1539 (W.D. MO 1983). Among other things, affirmative misrepresentations by counsel can, *384 and frequently will, give rise to a finding that counsel has acted in bad faith. Wright v. Jackson, 522 F.2d 955, 958 (4th Cir. 1975). Moreover, under federal law, assertion of a claim that is wholly lacking in merit may give rise to an inference that it was asserted for an improper purpose. Glick v. Koenig, supra, 766 F.2d at 270.
IV. DISCUSSION
With all of that as background, separate examination of the actions of Dr. Jaraki and of Mr. Cobb in creating and filing the affidavit and motion and in presenting evidence during the course of the hearing is now appropriate.
A. SANCTIONS
1. Dr. Jaraki
Rule 11 is inapplicable to Dr. Jaraki. There is no doubt, however, that the bad faith standard for fee-shifting has been met. Dr. Jaraki’s affidavit and his testimony at the hearing were substantially false and, as I have found, were known by Dr. Jaraki to be false. Dr. Rozenbaum did not promise to be a witness in the case. Dr. Rozenbaum had no contemporaneous knowledge of Dr. Jaraki’s problems at the Mel-rose/Wakefield Hospital or of his asserted reasons for leaving the Quincy City Hospital emergency room service. Whatever Dr. Rozenbaum learned about Dr. Jaraki’s problems, he learned largely from a visit with Dr. Jaraki after Dr. Jaraki left Quincy City Hospital. Beyond that, Dr. Rozenbaum had no contemporaneous knowledge of Dr. Jaraki’s asserted reasons for leaving the Quincy City Hospital because those reasons did not exist. Dr. Jaraki had formed a plan to leave the Quincy City Hospital, and had entered a binding contract requiring him to do so, long before he began to worry about the “recredentialing” process.[13]
To be sure, Dr. Rozenbaum did have some information that was helpful to the claims Dr. Jaraki asserts in this case. Dr. Rozenbaum was fully conversant with the efforts made to replace Paradigm and with Quincy City Hospital’s requirement for periodic “recredential-ing.” Dr. Rozenbaum’s testimony in that regard may still provide a corroborating platform from which Dr. Jaraki can launch at trial his claim about the reasons he left Quincy City Hospital. But Dr. Rozenbaum’s possession of that information did not make him a critical witness to anything. Indeed, even if I somehow am in error about my finding that Dr. Jaraki did not leave Quincy Hospital to avoid embarrassing disclosures, Dr. Rozenbaum still would not be a critical witness, for testimony about the nature of the efforts to replace Paradigm and about Quincy City Hospital’s requirements for periodic “recredentialing” surely was available from a variety of sources.
Finally, Dr. Jaraki at all times knew of Dr. Rozenbaum’s sincere and deeply-felt desire to avoid testifying in courtrooms for a variety or reasons stemming from his own background and his legal problems. That knowledge would not prohibit or even burden Dr. Jaraki’s unquestioned right to call Dr. Rozenbaum as a witness to testify truthfully about relevant matters on which he was competent to offer testimony. In this case, however, that knowledge underscores the appropriateness of imposing sanctions directly on Dr. Jaraki for that bad faith manner in which he, himself, represented the dealings he had had and the information he had obtained from Dr. Rozenbaum.
2. Attorney Cobb
a. Mass.R.Civ.P. 11
As stated earlier, see p. 19, supra, Rule 11 is violated when a paper is filed in bad faith and without reasonable inquiry. As also stated, a finding of “bad faith” requires a finding that a claim is “entirely without color and [has been asserted] ... for reasons of harassment or delay or for other improper purposes.” Nemeroffv. Abelson, 620 F.2d 339, 348 (2d Cir. 1980).
For the reasons detailed in the next section, I am of the opinion that Mr. Cobb filed the Motion for a Temporary Restraining Order in bad faith. It is clear that he did so not only without any reasonable inquiiy but without any inquiry at all. In so doing, he violated Rule 11.
b. Bad Faith
The federal cases discussed above limit the situations in which a finding of bad faith is appropriate, at least in this context, to those in which a claim is made “entirely without color and . . . for reasons of harassment or delay or for other improper purposes.” Nemeroff v. Abelson, 620 F.2d 339, 348 (2d Cir. 1980).
In my view, there is no question that the claim asserted in the motion is entirely without color, i.e., under circumstances where no “reasonable attorney could have concluded the facts supporting the claim might be established.” Id. To begin with, there was and is no lawyer named “Diane Taylor” at Taylor, Anderson or anywhere else. By the time he received from Dr. Jaraki the information about his alleged conversation with Dr. Rozenbaum, Mr. Cobb had received several different letters from the law firm of Taylor, Anderson during the course of the litigation. The Taylor, Anderson letterhead listed all of the firm’s lawyers, none of whom was “Diane Taylor” and none of whom was “Diane.” The Lawyers’ Diary and Manual and the MCLE Legal Directory, both familiar and convenient desk references widely used by Massachusetts attorneys, and Martindale Hubbell contained no listing for any “Diane Taylor” in Massachusetts except for a Dianne E. Taylor who worked for the City of Boston Law Department and who had no apparent connection whatsoever with this case or any of the parties or witnesses in this case.
Moreover, Dr. Jaraki’s affidavit on its face contained the kind of factual assertions that had to make a reasoning person pause even in a day when the unimaginable has become almost routine. A sitting federal judge, the affidavit stated, told Dr. Rozenbaum *385 that it would be “unethical” for him to testify against companies represented by his personal attorneys. Such advice is so plainly wrong, so plainly beyond the pale of any reasonable interpretation of any existing law and so plainly and manifestly beyond the pale of any principle ever discussed in any legal publication that any reasoning attorney would, at the very least, have had to wonder whether Dr. Jaraki was an accurate reporter of the conversation he was purporting in his affidavit to recount.
Dr. Jaraki’s account of what the Judge purportedly told Dr. Rozenbaum was transformed from the bizarre to the deeply malevolent by the allegation in ¶13 of Dr. Jaraki’s affidavit, i.e., “Dr. Rozenbaum said that he believed that Judge Gertner and Taylor were friends.” There, inferentially at least, is an explanation for the otherwise inexplicable: Judge Gertner gave Dr. Rozenbaum plainly crazy advice in order to help her friend, Taylor’s, law firm cheat its way to victory in a law suit.[14]
The affidavit does not say how Dr. Rozenbaum purported to know, or why he purported to believe, that Attorney Taylor and Judge Gertner were friends. It does not say that Judge Gertner told Dr. Rozenbaum that she and Taylor were friends or that Attorney Taylor told him so. It does not say that Dr. Rozenbaum gave Dr. Jaraki any information about the purported basis for his knowledge or belief. Mr. Cobb did not ask Dr. Rozenbaum at the hearing a single question about the basis on which he purportedly asserted that Ms. Taylor and Judge Gertner were friends and he did not ask Dr. Jaraki anything at all about that aspect of his alleged conversation with Dr. Rozenbaum. Indeed, Mr. Cobb did not ask a single question on that subject at all. For all that appears on the record, Dr. Rozenbaum’s purported assertion simply materialized out of nowhere and was totally without any asserted foundation whatsoever.
Surely, no reasonable attorney would have presented the account Dr. Jaraki presented without at least opening a book that likely sat on his desk or looking at a letter that likely rested in his file to find out whether “Diane Taylor,” the person whose friendship apparently drew the Judge into a terrible conspiracy, in fact existed.[15] Surely, no reasonable attorney could have expected that facts supporting a claim of friendship that, for all that this record shows, rested on the vapors might be established at an evidentiary hearing. Surely no reasonable attorney would have expected to prove the claims Dr. Jaraki’s affidavit contained given the information known and available to Mr. Cobb at the time the affidavit was filed.[16]
As stated earlier, the “bad faith” standard is met in this context only if the claim is without color and is asserted for an improper purpose. In my view, however, when a claim is shown to be wholly without color, as this one was, an inference should arise that the attorney asserted the claim for an improper purpose and the burden should shift to the attorney to persuade the fact finder that he or she did not do so. See generally Glick v. Koenig, 766 F.2d 265, 270 (7th Cir. 1985).
Placing on the attorney the burden of showing a proper purpose for filing a claim no reasonable attorney could have concluded might be established is appropriate for two reasons. First of all, the attorney typically is in the best position to know, and therefore to prove, why he or she took the action in question. In many contexts, the burden often is placed on the party with the most ready access to proof or who can most easily marshall the evidence required to prove the matter at issue. See generally P. Liacos, Handbook of Massachusetts Evidence 212 (6th ed. 1994).
Second, but perhaps more important, requiring an attorney who files a colorless claim either to justify doing so or to face sanctions is consistent with the disciplinary rules under which all attorneys must practice in this Commonwealth. DR 7-102(A)(l) prohibits a lawyer from “ asserting] a position . . . when it is obvious . . . that such action would serve merely to harass or maliciously injure another.” DR 7-102(A)(6) prohibits a lawyer from “[p]articipat[ing] in the creation or preservation of evidence when ... it is obvious that the evidence is false.” Filing a colorless claim, i.e., a claim no reasonable attorney could have expected to prove, closely approaches the area those rules limn. Not even the most zealous advocate is permitted to enter that area for it contains potential for great and unwarranted harm to reputation, to purse and to the profession as a whole. Placing the burden on those who closely approach the area to justify their action allows a close approach when close approach is necessary. At the same time, placing the risk of nonpersuasion on the attorney helps to insure that lawyers steer clear of the area as a matter of common practice. See generally Speiser v. Randall, 357 U.S. 513, 525-26 (1958); Schauer, Fear, Risk and the First Amendment: Unraveling the “Chilling Effect, ” 58 B.U.L. Rev. 685, 694-701 (1978). That result ultimately benefits all of society without compromising in the slightest the legitimate zealous and loyal advocacy to which all who seek legal advice historically have been entitled.
Here, Mr. Cobb has not satisfied his burden of persuasion that he asserted Dr. Jaraki’s colorless claim for a proper purpose. Mr. Cobb’s sole claim is that he asserted Dr. Jaraki’s claim because Dr. Jaraki made it and he consequently had an obligation to assert it. As demonstrated, that simply is not the law.
In sum, Mr. Cobb asserted a claim that no reasonable attorney could have expected to prove. He has not satisfied his burden of proving that he did so for a proper reason. As a consequence, I conclude that he asserted the claim in bad faith and that he, in addition to Dr. Jaraki, is liable for sanctions.
*386 3.Nature of Sanctions
Having concluded that imposition of sanctions against both Dr. Jaraki and Mr. Cobb is appropriate, the nature of the sanctions remains for consideration.
As to Dr. Jaraki, I sun of the opinion that the appropriate sanction is an award of the costs and expenses generated by the motion and the hearings thereon as to Dr. Rozenbaum and as to all defendants. On the basis of the affidavit filed James H. Anderson, Esq. on behalf of all defendants save Melrose/Wakefield Hospital, considered in light of the “lodestar” method for calculating attorneys fees, Fontaine v. Ebtec Corp., 415 Mass. 309, 324-26 (1993), I am of the opinion that the sum of $8,367.00 is the appropriate fee award.
As to Dr. Rozenbaum, the appropriate sanctions are reimbursement to him for the time he, himself, actually lost from his work and the legal expenses he incurred. As to the latter, the Affidavit of Ellen E. Cohen, Esq., considered in light of the “lodestar” method for fee calculation produces an award of $3,167.49. Based on his affidavit, I find fair compensation to Dr. Rozenbaum for the time he lost by attending the hearing amounts to $1,050.00.
As to Melrose/Wakefield Hospital, I decline to award any costs or fees, not because they had none and not because some of them were needless, but because Dr. Jaraki’s motion was aimed elsewhere and only the most minimal effort was truly essential to insure no adverse impact from a ricochet.
As to Mr. Cobb, I am of the opinion that the same monetary sanctions are appropriate. In addition, I am of the opinion that the matter should be referred to the Board of Bar Overseers for its determination, if, indeed, it chooses to undertake a determination, whether, by filing the motion and affidavit and proceeding thereon, Mr. Cobb violated DR 7-102(A)(1) (prohibiting a lawyer from “assert[ing] a position . . . when it is obvious . . . that such action would serve merely to harass or maliciously injure another”) or DR 7-102(A) (6) (prohibiting a lawyer from “participat[ing] in the creation or preservation of evidence when ... it is obvious that the evidence is false”) or both.
B. MOTION TO IMPOUND
The original impoundment order was, in my view, necessary because of the ex parte nature of the serious allegations the affidavit and motion made. Those allegations now have been tested in an adversary setting and found seriously wanting. The preceding opinion, together with the transcript of the hearing, demonstrates just how baseless and incredible those allegations turned out to be.
It is one thing to impound papers for the time necessary to allow the adversary process to work. Cf., e.g., In re San Juan Star Co., 662 F.2d 108, 115 (1st Cir. 1981). It is quite another to impound them after that process has run its course for, by then, the general principle of publiciiy assumes paramount importance. See, e.g., George W. Prescott Pub. Co. v. Register of Probate for Norfolk County, 395 Mass. 274, 278 (1985). That principle is founded on the notion that rumors and misinformation grow in the dark and that the public’s ability to view the court’s final handiwork is the best way to guard against their creation. Accordingly, I am of the opinion that the Motion to Extend the Impoundment Order should be, and it hereby is, DENIED.
C. MOTION TO STRIKE
There is, at this point, no practical purpose to be served by allowing the motion to strike. True, Dr. Jaraki’s affidavit is false and scandalous but judgment now is embodied in a judgment, memorandum and order of this court. Indeed, the pertinent parts of the affidavit were set forth in the memorandum itself. Striking the affidavit at this stage thus would amount to an act more symbolic than real. In the process, it would strip from the record the very document that led to the sanctions this court has imposed. All in all, as was suggested above, the most effective remedy for pernicious falsehood is exposure, not suppression.
V. ORDER
In light of the foregoing, it is hereby ORDERED as follows:
1. The Motion of Defendants Gatewood Associates, P.C., Spectrum Emergency Care, Inc. and Joseph Gatewood for sanctions is ALLOWED. Omar Jaraki, M.D., and Matthew Cobb, Esq., jointly and severally, shall pay to counsel for said defendants the sum of $8,367.00.
2. The Motion of Leonid Rozenbaum, M.D., for sanctions is ALLOWED. Omar Jaraki, M.D., and Matthew Cobb, Esq., jointly and severally, shall pay to counsel for Dr. Rozenbaum the sum of $3,167.49 and shall pay to Dr. Rozenbaum the additional sum of $1,050.00.
3. The Clerk of Courts is Directed to forward a certified copy of this Opinion to the Board of Bar Overseers for such investigation and action, if any, as said Board may deem appropriate.
4. The Motion to Strike the Affidavit of Omar Jaraki is DENIED.
5. The Motion to continue and extend the Orders of Impoundment is DENIED. All impoundment orders heretofore entered are VACATED.

See n.3, infra.

In addition, although he knew, or through Dr. Jaraki could have learned. Dr. Rozenbaum’s home address, he caused a subpoena to be served on Dr. Rozenbaum while Dr. Rozenbaum was attending a patient in the Quincy City Hospital emergency room.

Dr. Jaraki testified that those discussions began in January of 1994. I reject that testimony, crediting Dr. Rozenbaum’s testimony — testimony consistent with Mr Cobb’s offer of proof, see Tr. 24 — instead.

Although the record does not disclose precisely when Judge Gertner was sworn in as a federal judge, the conver *387 sation between Drs. JaraM and Rosenbaum appears to have taken place after that event occurred. There is no suggestion that either man knew then of Judge Gertner’s changed status.

The name of the case in which Ms. Cohen represents Dr. Rosenbaum was not disclosed at the hearing and was, without objection, elided from the copy of Ms. Cohen’s letter to Dr. Rosenbaum marked as an exhibit.

That letter manifested both an awareness of a real and tangible ethical problem for the Taylor, Anderson firm, see, e.g, Commonwealth v. Goldman, 395 Mass 495, 503-05 (1985), and a reasoned approach to resolution of that problem.

There was no suggestion at the hearing from anyone, Dr Jaraki included, that Dr. Rosenbaum ever told Dr. Jaraki that “Diane Taylor” was a friend of Judge Gertner’s.

I am unable on the present record to determine what, if anything Dr. Jaraki actually disclosed about the reason for his termination from Melrose/Wakefield during the Lawrence General application process. Dr. Jaraki claims to have disclosed fully the circumstances surrounding his departure from Melrose/Wakefield to Dr. Ieske, the Lawrence General Chief of the Department of Emergency Medicine. Dr. Jaraki claims that Dr. Ieske, in effect, told Dr. Jaraki that he should lie about those reasons during the Lawrence General credentialing process. For that reason, Dr Jaraki claims, he simply stated on his formal Lawrence General application that “money” was the reason for his separation from Mel-rose/Wakefield. That testimony is absurd and I reject it in its entirely.

The reason for the request that Dr Jar aki resign is unclear from the record. Dr. Jaraki maintains that the request stemmed from the resurrection in some fashion of the allegedly fabricated allegations made by Melrose/Wakefield staffers. Dr Jaraki’s testimony at the hearing, however, also suggests that a separate incident in which he was involved at Lawrence General Hospital may have formed at least a part of the basis for the request that he resign. I make no findings at all as to the request’s origin.

Dr. Ieske, the Lawrence General Hospital departmental chief who hired Dr. Jaraki, testified at his deposition that Dr. Jaraki said during the hiring process that he would not be able to work for Lawrence General Hospital after June of 1994 because he would be attending the University of Missouri program thereafter. Dr Jaraki has denied making that statement.

During the course of the hearing, Dr. Jaraki stated that after entering that contract with the University of Missouri, the contract was canceled, a new contract was sent to him and, although he signed the new contract, he did not do so until after the discussions about creation of a replacement for Paradigm. Significantly, however, Dr. Jaraki did not produce that contract at the hearing, has never produced that contract during the course of discovery although it was covered by discovery requests and Mr. Cobb knew nothing about it. As far as Mr Cobb was concerned then, the facts just recited are the facts of which he was aware.

Although he had an opportunity to do so, seeTr. 260-62, Mr Cobb did not testify at the hearing. The finding about his lack of investigation flows from his election not to testify, see, e.g., P. Liacos, Handbook of the law of Evidence, §5.11 (1994), as well as from the contents of his offer of proof in response to defendants’ effort to call him as a witness.

I recognize that the jury is the ultimate fact finder in this action. Insofar as this motion is concerned, however, I am required to find the necessary facts, basic and ultimate. The separate fact finding roles of judge and jury are not inconsistent and do not necessarily require consistent results. Cf. Chamberlayne School & Chamberlayne Junior College v. Banker, 30 Mass.App.Ct. 346, 353-55 (1991). Thus, my findings here do not prevent a jury from reaching a different conclusion on the evidence presented at trial.

Mr. Cobb has disavowed several times any attempt to link Judge Gertner and Attorney Taylor in a conspiracy to distort testimony. In context, however, the comments Mr. Cobb made at Page 119 of the transcript concerning “statement[s] made during the pendency of a criminal enterprise” refer to interaction between Judge Gertner, Dr. Rosenbaum and Attorney Taylor. Indeed, shortly after Mr. Cobb’s assertion of the criminal enterprise, I summarized that theory without objection from Mr. Cobb. Tr. 124. There is no doubt that at least one inferential import of Dr. Jaraki’s affidavit and the accompanying memorandum were that Judge Gertner, Ms. Taylor and Dr. Rosenbaum were linked in a conspiracy to suborn perjury. It is not, after all, the affidavit’s aim but what it hits that is truly relevant. Cf. New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co., 395 Mass. 471, 477-78 (1984).

Even after learning that “Diane Taylor" did not exist, Mr. Cobb did not stay his hand. At the hearing, he alleged that Judge Gertner, the by-then unknown lawyer and Dr. Rosenbaum were engaged in a “criminal enterprise.” Tr. 119, 124. Mr. Cobb asserts that I met that claim by “screaming” at him. Jaraki’s Opposition to defendants’ Motion for Sanctions at 7. That probably is a fair characterization of the manner in which I asked the immediately following questions about that assertion. SeeTr. 119, 1. 24 through 120, 1.4and Tr. 120, 1. 11 through 1. 13.1 clearly displayed my anger at what I believed, and believe now, was Mr. Cobb’s reckless conduct. For that reason, I took a recess to calm down. I should not have displayed that anger and I regret doing so. At the time Mr. Cobb asserted that Judge Gertner was engaged in a “criminal enterprise,” however, he had not introduced at the hearing a scintilla of evidence that tended in that direction. Indeed, he had finished his examination of Dr. Rozenbaum without asking him a single question about any conversation he had had with Judge Gertner or about how he knew that ‘Taylor,” or some other lawyer representing him, was Judge Gertner’s friend. By the time of Mr. Cobb’s assertion, Dr. Jaraki himself had testified only about the advice Dr. Rozenbaum purportedly said that Judge Gertner had given, advice that was ludicrous but not criminal. By the time of Mr. Cobb’s assertion, he had made no suggestion, by offer of proof or otherwise, about the “pact” testimony he elicited from Dr. Jaraki after the recess, “pact” testimony that, insofar as Judge Gertner was concerned, was absent from his affidavit. Finally, by the time he made his assertion, Mr. Cobb had already demonstrated his willingness to forge ahead with an effort to obtain an injunction against Judge Gertner without making her a party to the action and without thinking seriously about whether any injunction could issue against her unless she was a party. Tr. 9-12. Compare, e.g., Heyman v. Kline, 444 F.2d 65 (2d Cir. 1971). Under all of the circumstances, it seemed to me then, as it now seems to me, that for Mr. Cobb to make assertions of “criminal enterprise” on that record was almost mindlessly reckless.

Although far more a matter of judgment and discretion than factual allegations of the type just discussed, Mr. Cobb’s claim that Dr. Rozenbaum was a witness critical to his damage claim is equally colorless. Mr. Cobb knew that Dr. Jaraki had contractually bound himself to attend the University of Missouri, and thus to leave Quincy Ciiy Hospital, months before the “recredentialing" process required him to disclose any unfavorable information to Quincy City Hospital’s accreditation committee and months before any discussion among the emergency room physicians concerning replacement of Paradigm. Mr. Cobb also knew that Dr. Jaraki did so pursuant to long-standing plans to seek academic pursuits.